**AMERICAN POSTAL WORKERS UNION, AFL–CIO**

v.

**UNITED STATES of America, Appellant.**

**No. 90–5041.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 29, 1990.

Decided Feb. 22, 1991.

Robert S. Pomerance, Atty., Dept. of Justice, with whom Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Bruce R. Ellisen, Attys., Dept. of Justice, Washington, D.C., were on the brief for appellant.

Robert E. Falb for appellee. Bardyl R. Tirana, Washington, D.C., also entered an appearance for appellee.

Paul S. Berger, Cynthia M. Lewin and Laurence Gold, Washington, D.C., were on the brief for amicus curiae urging that the judgment of the District Court be sustained.

Before MIKVA, Chief Judge, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The American Postal Workers Union, AFL–CIO, a tax-exempt organization under § 501(c)(5) of the Internal Revenue Code, sponsors a health plan for its members and their dependents. It also permits classified federal employees who are not postal workers to participate in the plan on payment of regular insurance premiums and an annual fee of $35. It calls the $35 payment "dues" and the non-postal enrollees "associate members", but their dues and membership yield no privilege other than access to the health plan. The Internal Revenue Service concluded that the "dues" were "unrelated business taxable income" under §§ 511–513 of the Internal Revenue Code and issued notices of tax deficiencies for fiscal years 1982 and 1983. The union paid the taxes and sued for a refund in district court. The court rejected the IRS's position and found for the union. We reverse.

\* \* \* \* \* \*

Section 511(a)(1) of the Internal Revenue Code imposes a tax on the "unrelated business taxable income" of otherwise tax-exempt organizations, § 512(a)(1) defines such income, and § 513(a)(1) defines "unrelated trade or business". Treasury regulations summarize all this by explaining that income is "unrelated business taxable income" if "(1) it is income from trade or business, (2) such trade or business is regularly carried on by the organization, and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt functions." Treas.Reg. § 1.513–1(a); see also *United States v. American Bar Endowment*, 477 U.S. 105, 109–10, 106 S.Ct. 2426, 2429, 91 L.Ed.2d 89 (1986); *United States v. American College of Physicians*, 475 U.S. 834, 838–39, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986). The purpose behind taxing such income is to protect ordinary, taxpaying businesses from unfair competition. See Treas.Reg. § 1.513–1(b); *American Bar Endowment*, 477 U.S. at 114, 106 S.Ct. at 2431; *American College of Physicians*, 475 U.S. at 837–38, 106 S.Ct. at 1593–94.

It is undisputed that the union's provision of health plan services to non-postal federal employees satisfies the second of the three criteria—it is "regularly carried on". Thus the case turns on the other two. The IRS prevails if (1) the provision of these services is *not* "substantially related to" the exempt purposes or functions of a "[l]abor ... organization", see § 501(c)(5), i.e., does not "contribute importantly to" those functions, see Treas.Reg. § 1.513–1(d)(2); and (2) the dues received from associate members constitute "income from a trade or business". The district court decided that the sale of health insurance to non-postal workers satisfied neither of the two disputed criteria; we conclude that it meets both.

### Not Substantially Related to Exempt Purposes

■ There appears to be nothing in the Treasury Regulations or any other authoritative source defining the exempt purposes of a labor organization. In determining whether the provision of health insurance to non-postal federal workers is "substantially related" to such purposes, however, a useful starting point is the union's own statement of purposes. Compare *National Ass'n of Postal Supervisors v. United States*, 21 Cl.Ct. 310, 320, 324 (1990) (looking to the union's stated purposes as a criterion). The American Postal Workers Union has set this forth in Article 2 of its Constitution ("Objectives"), a copy of which is included in the appendix to this opinion. A focus on the interests of postal workers permeates the statement. Sections 2 through 5 address exclusively the goals of organizing all (non-supervisory) postal workers into a single union. Section 6 restates the purpose, expressing it as the goal of uniting in a single organization all workers under the "jurisdiction" of the union, which is stated in Article 4 (also included in the appendix) exclusively in terms of postal operations.

Several sections speak to the interests of the union's "members", but these are defined in Article 3, § 1 as non-supervisory employees "within the jurisdictional claim of the [union]", which (to repeat) is limited to postal operations. While the "Members' Bill of Rights" set forth at the head of the Constitution states that "[e]very member" has the right to participate in union activities and support candidates of his or her choice, and that a member shall not be denied the right to vote or seek office on grounds of race, color, sex, age or religion, in fact those rights are confined to active members, members at large and certain retired members; they do not extend to "associate members" (and certain retired members). "Agreed Stipulated Facts", Joint Appendix ("J.A.") 75. As the name American Postal Workers Union implies, the union represents its postal worker members in collective bargaining, grievance procedures and arbitration; it provides no such representation for its "associate members". *Id.*; see also *American Postal Workers Union v. United States*, "Findings of Fact and Conclusions of Law" ("Findings"), No. 88–1091 (D.D.C. Dec. 19, 1989), J.A. 90–91. It appears that a non-supervisory postal worker could not be an associate member, but only an active member paying full dues (about $77 a year for the years in question). Findings, J.A. 90.

In effect the union's activities divide into two analytically severable classes: those of a labor union that benefits postal worker members with a full range of services (including, among many other things, health insurance), and those of an insurance plan open to almost everybody else in the federal government. Calling the non-postal health plan enrollees "associate members" cannot change that. The union's strategy looks similar to one betrayed by a speaker at the convention of the National Association of Postal Supervisors (a wholly separate union), who apparently assumed that one could secure favorable tax consequences simply by semantic manipulation:

> We do indeed have some tax problems.... It is very important that we handle this whole thing right. It is also very important that we change the bylaws to recharacterize our [health-plan only] members as not limited benefit members but as Federal members.... [A] lot of money is at stake.

See *National Ass'n of Postal Supervisors*, 21 Cl.Ct. at 324 n. 14. But in fact tax law is typically quite resolute in probing for substantive reality: "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938); see also *Boyter v. Commissioner*, 668 F.2d 1382, 1386 (4th Cir.1981) (citing cases).

The district court made much of the union's legislative lobbying efforts to advance the interests not simply of postal workers, but of federal employees in general. In one case, gleaned from an undefined span of years, the union lobbied for a provision that (arguably) benefited virtually all federal workers *except* postal employees. See

Findings, J.A. 91–93. Yet a labor union cannot render its business affairs "substantially related" to its exempt functions simply by lobbying in behalf of its clientele. Any contrary rule would expose tax-paying businesses to an onslaught of competition from tax-exempt ones; a union could run a tax-exempt insurance plan (or any business) for virtually anyone, simply by lobbying from time to time on behalf of "labor" or "working people".

In its *amicus* brief, the AFL–CIO argues that the history of labor organizations compels us to rule for the union. It argues that (1) unions characteristically provided insurance but not collective bargaining representation when Congress made them tax-exempt in 1909; (2) not all unions have been organized along lines of common employment; and (3) unions have historically had several membership classes, each with different rights and obligations. See also Rev.Rul. 62–17, 1962–1 C.B. 87 (stating that labor unions were exempted from taxation "for the very reason that they operated, in part, as mutual benefit organizations providing death, sick, accident, and similar benefits to their members").

Without contesting the accuracy of this history, we note that the argument proves far too much. The *amicus*'s logic would apparently permit anyone to start up an insurance company, call it a "union", and solicit the tax-exempt business of workers anywhere. Such a rule would defeat the purposes of taxing unrelated business income, at least as to businesses providing any service paralleling one that unions provided in 1909.

We need not, of course, decide the case of a union that actually functions as the kind of mutual insurance association that the *amicus* depicts. The *amicus* does not point us to a *single* example of a 1909 vintage union that parallels the present arrangement, with one class of members receiving a broad range of membership benefits and another receiving only access to an insurance plan. Much less does it

assert that any such arrangement was characteristic. Thus we simply hold that provision of insurance benefits to persons who are not members in *any* other sense cannot be substantially related to a union's tax-exempt purposes. Cf. *National Ass'n of Postal Supervisors v. United States*, 21 Cl.Ct. at 325.

Nor does our holding affect the status of the union's retired members, who pay membership dues of $3 a year and enjoy no voting rights, but who retain membership in the health plan. See Union Constitution, Art. 3, § 4(d). For them, continued membership in the health plan is part of a bundle of benefits enjoyed by virtue of having been full members in the past.[1]

Once we rule out the tenuous relationships based on lobbying and the historic operations of unions as mutual benefit societies, it appears that the provision of health insurance to non-postal workers relates to the union's tax-exempt purposes solely as a source of income, which is plainly not enough. See Treas.Reg. § 1.513–1(d)(1) ("substantially related (other than through the production of funds)"). Accordingly, the district court's finding of a substantial relationship—whether one thinks of it as a factual finding or, perhaps more accurately, as a legal characterization, cf. *Levin v. Commissioner*, 832 F.2d 403, 406 (7th Cir. 1987)—was clearly erroneous.

### *Trade or Business*

■ The final question is whether the union's provision of health insurance to non-postal workers is a "trade or business" within the meaning of § 513(a) and Treas. Reg. § 1.513–1. The Supreme Court has suggested—and the parties agree—that the test for this is whether the activity " 'was entered into with the dominant hope and intent of realizing a profit.' " *American Bar Endowment*, 477 U.S. at 110 n. 1, 106 S.Ct. at 2429 n. 1, quoting *Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir. 1984); see also *Illinois Association of Professional Insurance Agents v. Commis-*

---

**1.** We do not here address the separate issue of whether 5 U.S.C. § 8903(3) (Supp.1990) authorizes the union to solicit the business of non-

postal employees under the circumstances presented here.

*sioner,* 801 F.2d 987, 990–91 (7th Cir.1986). As the Fourth Circuit has aptly said in a similar case, "[T]here is no better objective measure of an organization's motive for conducting an activity than the ends it achieves." *Carolinas Farm & Power Equipment Dealers v. United States,* 699 F.2d 167, 170 (4th Cir.1983); see also *Portland Golf Club v. Commissioner,* — U.S. ——, 110 S.Ct. 2780, 111 L.Ed.2d 126 (1990) (lack of intent to profit based on accounting determination of no profit). It is also highly material that the activities are ones that "can be—and are—provided by private commercial entities in order to make a profit," *American Bar Endowment,* 477 U.S. at 111, 106 S.Ct. at 2430, as health insurance plainly is. The burden of proof is "on the taxpayer to show that the commissioner's determination is invalid." See *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935).

Virtually all of the $35 charged as "dues" for non-postal workers appears to be net income for the union. The cost of processing "associate membership" receipts evidently runs about $2.50 per head. See J.A. 90, 572. The union notes that under its constitution it must also remit $5 per head to the local in the area where the non-postal employee works, see Art. 3, § 6, and asserts in its brief that this is reimbursement for the locals' costs. But it identifies no record support for the existence of any such costs. If such evidence lurks in the record, its only effect would be to reduce the union's net per head to about $27.50, nearly 80% of its gross charge.

The union also points to administrative costs totalling $707,405 in 1982 and $890,-417 in 1983 in connection with its *sponsorship* of the health plan. The tasks performed by the union as sponsor include such matters as designing benefits, soliciting enrollment and supervising claims. Yet for these services the union is reimbursed by a separate entity, the American Postal Workers Union Health Plan, referred to by the parties as "the Trust". Out of the premiums, the Trust pays the union a "service fee", which was more than enough to cover these sponsorship costs in both the years in dispute. See J.A. 101.

(In any event, the figures encompass expenses for *all* enrollees in the health plan, not just the three to four per cent accounted for by non-postal workers.)

In the same vein, the union points to evidence that the Trust operated in the red during the early 1980s. But there appears no evidence that the union assumed the loss or that the Trust had any right to expect that it would. And as the union and the Trust are wholly separate entities with separate books and assets, the union cannot simply pretend that the Trust's losses are its own. Even if the union had assumed the loss, and had as a matter of union accounting "taken" the sum from the "dues" of "associate members", such an accounting practice would hardly show that it did not enjoy net income *on its provision of the service to non-postal workers.* A tax-exempt entity's decision to use its unrelated business income to subsidize a parallel tax-exempt project does not change the income into loss.

As it did on the substantial relationship issue, the union points to lobbying efforts of possible value to the non-postal enrollees, here suggesting that the lobbying costs offset the income. We reject the claim for similar reasons. If a union can invoke the cost of activities so vaguely related to the interests of persons whose sole concrete relationship to it is as insurance enrollees, unions (and similarly situated exempt entities) would have carte blanche to engage in profit-making ventures in competition with taxable businesses. We note that even the union's own constitution makes no claim that associate members are beneficiaries of its lobbying, identifying them as workers "accepted as associate members for Health Plan participation *only.*" Art. 3, § 6 (emphasis added).

Finally, in the face of overwhelming evidence of substantial net profit, the union points to the testimony of its employees and agents that the prospect of earning profits had never appealed—or even occurred—to anyone. Apparently we are invited to believe that the profit received was, as has been said of the British empire,

merely picked up in moments of absent-mindedness. Given the traditional view that parties intend the obvious consequences of their acts, we join the other courts that have highly discounted such self-serving testimony. See, e.g., *Illinois Association*, 801 F.2d at 992; *National Ass'n of Postal Supervisors*, 21 Cl.Ct. at 322.

Given the union's substantial net income from the service, the district court's finding of the absence of a "trade or business" was clearly erroneous.

    \*    \*    \*    \*    \*    \*

For the foregoing reasons, we reverse.

*So ordered.*

## APPENDIX

*Constitution of American Postal Workers Union*

### ARTICLE 2

*Objectives*

SEC. 1. It shall be the objective of the APWU to secure through collective bargaining and legislative effort a safe and healthy work environment, better working conditions and a better standard of living for the members of the APWU and their families.

SEC. 2. The APWU affirms its belief in a single union of all postal workers in non-supervisory levels. The APWU will make every effort to bring into being a single union of all postal workers by mergers with other postal unions, and initiating intensive all-out organizing campaigns reflecting the APWU philosophy.

SEC. 3. The APWU will vigorously oppose any labor unions outside the Postal Service moving into the Postal Service union field.

SEC. 4. The APWU will call on the American Federation of Labor–Congress of Industrial Organizations, and its President, to aid in the cause of merging all postal unions into one single union.

SEC. 5. The APWU will continue to organize the unorganized.

SEC. 6. To unite within one organization, regardless of sex, race, age, creed, color, political affiliation or nationality, all employees under the jurisdiction of the APWU.

SEC. 7. To educate our membership and the general public in the history of the Labor Movement and to develop and maintain an intelligent and dignified membership to vote and work for the election of candidates who favor the passage of improved legislation in the interest of all labor. To work for the repeal of laws which are unjust to labor and to the postal workers such as the denial of the right to strike and the denial of the right to support political candidates of their choice; and to educate all members in the area of economic, political and social justice.

SEC. 8. To engage in legislative, political education, civic, welfare and other activities which further, directly or indirectly, the joint interests of the membership of this union in the improvement of general economic and social conditions in the United States of America.

SEC. 9. (a) To work as an autonomous union affiliated with the American Federation of Labor–Congress of Industrial Organizations, together with other national and international unions for the solidification of the entire Labor Movement.

(b) The National Executive Board may provide assistance, financial and otherwise, to labor and other organizations in the United States and other parts of the world having purposes and objectives similar or related to those sought by this Organization.

SEC. 10(a) The APWU is established as an industrial union, including in its membership postal workers of all crafts who are not classified as supervisors. Its top leadership shall consist of a President, Executive Vice President, and Secretary–Treasurer.

(b) All postal crafts will be established on a departmental basis within the structure of the APWU. Each craft department shall be headed by its own Director and other necessary officers, who shall be members of the particular craft and shall

be elected only by members of that craft. This administrative structure is to apply similarly in the organization of local, area, state and regional unions affiliated with the APWU wherever feasible.

## ARTICLE 4

### *Jurisdiction*

The jurisdiction of the APWU includes all postal and mail handling operations, including but not limited to all work or operations directly or indirectly related to postal and mail handling operations, whether performed by employees of the U.S. Postal Service or any other employer, and including any operations that transmit message [sic] by electronic or other means, and including personnel in headquarters, regional offices and technical support operations.