TEXAS FARM BUREAU, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. W–91–CA–206.

United States District Court,
W.D. Texas,
Waco Division.

April 12, 1993.

Andy McSwain, Fulbright, Winniford, Bice & Davis, Waco, TX, for plaintiff.

Susan Ralston McLean, Dept. of Justice, Dallas, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

Came on to be considered the Defendant's Motion for Summary Judgment. The Plaintiff has responded to this Motion, to which the Defendant has replied.

### I. *Background*

This case was originally filed by the Texas Farm Bureau ("TFB") against the United States of America ("USA") seeking a tax refund of $2,126,208.48 for TFB's fiscal years ending October 31, 1984–1987. The tax refund claims relate to income received by TFB from Southern Farm Bureau Casualty Insurance Company ("Casualty), and from Southern Farm Bureau Life Insurance Company ("Life"). The two issues raised in this case, and serving as the basis for the refund claims, are: (1) whether the income paid to TFB is taxable as "unrelated business income" pursuant to I.R.C. §§ 511–513 because the activities giving rise to the income are not "substantially related" to the purpose constituting the basis for TFB's exemption, and, if so, (2) whether the income paid to TFB falls into the royalty income exception to the unrelated business income tax pursuant to I.R.C. § 512.

Casualty and Life were formed by two different groups of state Farm Bureaus located in the Southern region of the United States, including TFB. At the time of their formation, Casualty and Life were to serve two goals: (1) provide insurance to rural

residents at reasonable rates, and (2) provide member benefits for Farm Bureau members, most of whom were located on farms, ranches, and in rural areas.

Under agreements with Life and Casualty, TFB is paid a low percentage of premiums, one percent (1%) for Casualty products, and a varied percentage for various Life products. On its original returns for the years in suit, TFB reported and paid an "unrelated business income" tax on certain income received from Casualty and Life. Subsequently, TFB filed a claim for refund of its 1984, 1985, 1986, and 1987 tax years. It sought refunds of $321,766.00, $579,051.00, $411,424.00, and $550,263.00, which it had paid on insurance fees of $2,855,989.00, $3,335,827.00, $2,962,538.00, and $3,170,750.00 for the 1984, 1985, 1986, and 1987 years, respectively, for a total of $1,862,504.00,[1] plus interest paid of $263,704.48, for a grand total of $2,126,208.48, plus statutory interest.[2]

Count One of TFB's Second Amended Complaint states that the income from which TFB seeks a tax refund is *royalty* income primarily derived from the use by Life and Casualty of its name and, in small part, derived from rental of approximately 1700 square feet in the Texas Farm Bureau building in Waco, Texas. Therefore, TFB believes that pursuant to I.R.C. § 512 said income is not taxable.

Count Two of TFB's Second Amended Complaint states that said income is *not* unrelated business taxable income under I.R.C. § 512(a)(1) because: (1) it is not income from a "trade or business"; or (2) if it is a trade or business, it is not regularly carried on; or (3) if it is income from a trade or business, it is substantially related to the performance of the exempt functions of TFB.

## II. *Summary Judgment*

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears an "exacting burden of demonstrating that there is no actual dispute as to any material fact in the case." *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir.1982).

In determining whether the movant has met its burden, the Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *See id.* at 1031. All reasonable doubts as to the existence of a genuine issue of material fact must be resolved against the movant. *See id.* at 1031; *Jones v. Western Geophysical Co.*, 669 F.2d 280, 283 (5th Cir.1982). When determining whether to grant summary judgment, the Court is merely determining whether a factual dispute exists and is not required to resolve those disputes. *See Jones*, 669 F.2d at 283. The fact that it appears to the Court that the non-movant party is unlikely to prevail at trial or that the movant's statement of facts appears more plausible is not a reason to grant summary judgment. *See id.* at 283.

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond with any factual assertion that would preclude summary judgment. *See Cleckner v. Republic Van & Storage Co.*, 556 F.2d 766, 771 (5th Cir.1977). Rule 56(e) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate,

---

**1.** The USA's Motion incorrectly states that these four figures add up to $1,862,564.00. *USA's Motion, Appendix B* at 3. This mathematical error has been corrected by the Court.

**2.** The TFB's Response (and the Joint Pretrial Order) incorrectly cited a 1987 tax year figure of $552,063.00, apparently transposing the numbers 0 and 2, thereby making the four year total

$1,864,304.00 plus $263,704.48 in interest for a grand total of $2,128,008.48. *TFB's Response* at 4; *Joint Pretrial Order* at 3. Review of the Second Amended Complaint, as well as the relevant tax return, indicates that said figures are incorrect. The correct figures have been cited by this Court.

shall be entered against him." In this respect, the burden on the non-moving party is not especially heavy; however, he must show specific facts that present a genuine issue of material fact worthy of trial rather than showing mere general allegations. *See Gossett v. Du–Ra–Kel Corp.,* 569 F.2d 869, 872 (5th Cir.1978).

### III. *Discussion*

As a general rule, agricultural organizations, such as TFB, are exempt from taxation pursuant to § 501(c)(5) of the Internal Revenue Code. Exempt organizations are liable for certain taxes under limited circumstances. One such potential tax, and the tax in dispute in this case, is the unrelated business income tax. Section 512(a) of the Internal Revenue Code provides that "unrelated business taxable income" is gross income derived from any unrelated trade or business regularly carried on by it, less any deductions allowed by this provision. Section 513(a) provides that "unrelated trade or business" means any trade or business the conduct of which is not substantially related to the organization's exempt purpose.

### A. UNRELATED BUSINESS INCOME:

■ The first argument asserted by TFB is that the amounts paid to TFB under TFB's agreements with Life and Casualty constitute income that is not unrelated business income ("UBI") pursuant to I.R.C. §§ 511 and 512. In other words, TFB argues that the income is "related" to the exempt purpose of TFB, and as such, is not taxable. In order to constitute UBI, and therefore be taxable, the activity that produces the income must satisfy three elements: (1) the activity from which the income is derived must be a "trade or business"; (2) the trade or business must be regularly carried on by the organization (this is conceded by TFB if there is a trade or business); and (3) the conduct of the trade or business must *not* be substantially related to the organization's tax exempt purpose. 26 U.S.C. §§ 511–513. *Texas Apartment Association v. United States,* 869 F.2d 884 (5th Cir.1989); *California Farm Bureau Federa-*

tion v. United States, 769 F.Supp. 332, 334 (E.D.Cal.1991).

### 1. *Trade or Business*

■ Section 513(c) of the Internal Revenue Code defines trade or business as "any activity which is carried on for the production of income from the sale of goods or the performance of services." 26 U.S.C. § 513(c). Interpreting the plain language of the statute, the Fifth Circuit has held that the existence of a *profit motive* is the most important indication of whether an activity is a trade or business. *Louisiana Credit Union League v. United States,* 693 F.2d 525, 532–33 (5th Cir.1982). Additionally, the regulations promulgated pursuant to § 513 also employ a "profit motive" test. *Id.* Thus, to determine whether TFB, a tax exempt organization, is carrying on a trade or business, this Court must determine "whether that institution is engaged in extensive activity over a substantial period of time with the intent to earn a profit." *Id.* at 532 (citing *Professional Insurance Agents v. Commissioner,* 78 T.C. 246 (1982)).

■ The USA argues that TFB's pervasive activities endorsing and administering insurance requires a finding of profit motive. In *National Water Well Association v. Commissioner,* 92 T.C. 75 (1989) (attached as Exhibit C to USA's Appendix B), a trade association for the water well industry, exempt from taxation as a business league under § 501(c)(6), actively promoted and endorsed an insurance program and received certain dividends from the company which the Internal Revenue Service claimed was UBI. The court held that the taxpayer's receipt of dividends, its performance of administrative services for the insurance program, and its endorsement and promotion of the insurance program to its members constituted a trade or business. *Id.* at 92. The Court stated that "profit motive can be inferred in this case from the objective facts that petitioner was extensively involved in endorsing and administering a program that proved highly profitable." *Id.* (citing *Louisiana Credit Union League* ).[3]

3. The Court went on to state that "[i]n agreeing to sponsor and promote that insurance program,

TFB argues that the circumstances of this case are wholly distinguishable from *National Water Well Association* and *Louisiana Credit Union League*.[4] While TFB admits that it does provide certain administrative and clerical services to Life and Casualty, it argues that it provides those services on a reimbursement basis. *TFB's Response Brief* at 2. Additionally, TFB states that the remainder of the payments it receives are intended by the parties to be royalty payments for the association of TFB with Life and Casualty in the State of Texas, and the inherent goodwill of TFB. TFB states that it is *not* in the business of providing insurance to its members, and it does not actively promote or sell insurance to its members on a systematic or commercial basis. *Id.* at 2 n. 1.

TFB therefore concludes that the USA has failed to provide adequate summary judgment proof that its activities are intended to earn a profit. Rather, "the intent and hope of TFB is, and was, that the insurance products and services provided by Life and Casualty would benefit both its members, and the rural and farm communities of the State of Texas." *Id.* at 3–4.

 Under the plain language of the statute, this Court is of the opinion that TFB's activities clearly constitute a "trade or business" because TFB's clear intent is to earn a profit. TFB's arguments to the contrary are unpersuasive, semantic attempts to divert this Court's attention. As the Fourth Circuit pointed out in *Carolinas Farm and Power Equipment Dealers Association v. United States*, 699 F.2d 167, 170 (4th Cir.1983), "there is no better objective measure of an organization's motive for conducting an activity than the ends it achieves." As in *National Water Well Association*, TFB is intimately involved in the insurance businesses of Life and Casualty. Not only is TFB a percentage owner of said companies, it also receives set amounts of compensation based upon how many of its members buy insurance policies. Although the exact amount is somewhat disputed, it is clear that ratio of income in relation to member dues is over 75 percent.[5] This Court believes that this factor is indicative of TFB's profit motive. TFB's argument of a contrary intent is without merit. As the D.C. Circuit stated in *American Postal Workers Union v. United States*, 925 F.2d 480, 484–485 (D.C.Cir.1991), "[a]pparently we are invited to believe that the profit received was, as has been said of the British Empire, merely picked up in moments of absentmindedness." The Court went on to state that "[g]iven the traditional view that parties intend the obvious consequences of their acts, we join the other courts that have highly discounted such self-serving testimony." *Id.* at 485. TFB's substantial net income from the Life and Casualty clearly constitutes a "trade or business" as that term is defined in I.R.C. § 513.[6]

### 2. Regularly Carried on Trade or Business

In light of this Court's determination that TFB's activities do constitute a "trade or business," TFB concedes that said trade or business is regularly carried on. *TFB's Response Brief* at 1.

---

petitioner provided Maryland Casualty with its membership lists, wrote articles on safety and its effects on insurance, provided exhibit space to Maryland Casualty at its conventions and meetings, and employed someone, who was not compensated by the insurer, to answer inquiries regarding the insurance. Additionally, petitioner placed advertisements for the insurance in its journals, which advertisements did not mention the insurer.... As a selling point in its application for new members, petitioner listed the programs as one of the direct benefits of membership in the organization." *Id.* at 92–93.

**4.** This Court recognizes that the activities in *Louisiana Credit Union League* are much more active

than any evidence in the record as to TFB. The present case, however, is still reasonably analogous to *Louisiana Credit Union League*, and very analogous to *National Water Well Association*.

**5.** The USA claims the ratio is 95 percent, while TFB claims the ratio to be 76 percent. *See USA's Brief* at 3; *TFB's Brief* at 3 n. 5.

**6.** The Court notes that TFB's involvement in insurance activities far outweighed that of the Professional Association of Insurance Agents, which the Seventh Circuit found to be a trade or business that had UBI in *Illinois Association of Professional Insurance Agents v. Commissioner*, 801 F.2d 987, 991 (7th Cir.1986).

### 3. *Substantially Related to Exempt Purpose*

■ In determining whether an activity is, or is not, substantially related to the exempt purpose of an organization, there must be an "examination of the relationship between the business activities which generate the particular income in question … and the accomplishment of the organization's exempt purposes." 26 C.F.R. § 1.513–1(d)(1). More particularly, the trade or business is related to exempt purposes "only where the conduct of the business activities has [a] causal relationship to the achievement of exempt purposes; and it is *substantially related,* for purposes of section 513, only if the causal relationship is a substantial one." 26 C.F.R. § 1.513–1(d)(2). "Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services must *contribute importantly* to the accomplishment of those purposes." *Id.* (emphasis added). "In determining whether activities contribute importantly to the accomplishment of an exempt purpose, the *size* and *extent* of the activities involved must be considered in relation to the nature and extent of the exempt function which they purport to serve. 26 C.F.R. § 1.513(d)(3) (emphasis added). This determination is very fact sensitive and must be made on a case by case basis. 26 C.F.R. § 1.513(d)(2).

To a large extent, the primary dispute between USA and TFB is which caselaw is applicable: that involving business organizations under § 501(c)(6), or that involving labor organizations under § 501(c)(5). TFB argues that because § 501(c)(5) exempts "labor, agricultural, or horticultural organizations," the caselaw involving labor organizations should be applicable to agricultural organizations. USA, on the other hand, argues that "the Fifth Circuit has already gone on record applying the same law to both 501(c)(5) agricultural organizations and 501(c)(6) business leagues." *USA's Brief* at 7. Both sides argue that the legislative history supports their viewpoint.

TFB's exempt purpose is somewhat undisputed in this case. With regard to Life, TFB first cites a history of under-service and difficulty in obtaining insurance at economical prices in the rural market. Second, the County Farm Bureau maintains a presence in rural counties other insurance companies do not adequately serve. Third, Life provides estate planning services specific to the needs of TFB's farmers and ranchers. Fourth, Life provides life and disability coverage to farmers and ranchers who are poor underwriting risks. Fifth and finally, this insurance furthers an important purpose of TFB—to provide a profitable and desirable business and personal life for farmers and ranchers.

TFB also asserts several reasons why the Casualty insurance services are "substantially related" to TFB's exempt purpose. First, TFB cites a history of under-service and uneconomical costs in the rural insurance market. Second, Casualty maintains a presence in each county where there is a Farm Bureau. Third, the insurance agents of Casualty, its adjusters and underwriters, are specially trained to deal with the risks of rural life. Fourth, Casualty provided workmen's compensation to member farmers and ranchers at a time when such was difficult to obtain. Fifth, Casualty sells all the kinds of casualty and property insurance a farmer or rancher would need. Sixth and finally, that this insurance provides a profitable and desirable business and personal life for farmers and ranchers.

■ In *Louisiana Credit Union League v. United States,* 693 F.2d 525 (5th Cir.1982), the Fifth Circuit Court of Appeals examined the "substantial relationship" question. The Court, after first quoting the relevant regulatory language, went on the set forth two factual elements which are particularly critical to finding the necessary substantial relationship between a business league's activities and its purposes: (1) the unique nature of the activities vis-a-vis the organizational function, and (2) the capacity in which benefits are received by the organization's members.[7] The Court found no substantial rela-

---

**7.** Although this case dealt with a business league, the Court cited Revenue Ruling 60–228, 1960–1

tionship between the insurance activities and the exempt purpose of the organization. The benefits from the § 501(c)(6) business league's activities inured to the members as individuals rather than as members of the group. Moreover, the "insurance endorsement and administration is not the sort of *unique activity* that satisfied the substantial relationship test." *Id.* at 536.

TFB does not satisfy the group-benefit or the uniqueness test. The members of TFB received benefits in proportion to the premiums paid; there were no inherent benefits to the organization. Two witnesses, including TFB's CEO, have admitted the personal economic benefit of the insurance was greater than any benefit to the organization. The sponsoring of an insurance program to members by providing administrative, promotional, and endorsement services is the kind of activity companies do for profit and is not unique. *See id.* at 536. Accordingly, this Court is of the opinion that said activities, as a matter of law, do not meet the "substantial relationship" test.

Additionally, TFB's activities in this case do not *contribute importantly* to the accomplishment of its exempt purposes. The USA admitted (for purposes of this motion) the various purposes of TFB outlined above. While this Court does agree that insurance services provided by TFB to its members does better the condition of those engaged in agricultural pursuits, there is no substantial casual relationship between the insurance and the improvement of agricultural products or the development of a higher efficiency in agriculture.[8] Any agricultural benefits were incidental to the general provision of commercial insurance services.

■ Since the "size and extent of the activities involved must be considered in rela-

tion to" the exempt function, it is highly significant in this case that the bulk of the insurance offered was available in the commercial market. 26 C.F.R. § 1.513(d)(3). An activity is less likely to be substantially related if it is one commonly provided by for-profit entities. The insurance included various types of life insurance, automobile, homeowners, general liability and various other property and casualty insurance, as well as those policies that the USA admits could possibly be "related," such as workmen's compensation policies for farmers and ranchers.[9] It is also quite clear that many TFB members who are benefitted by these insurance policies are not even ranchers or farmers. *See American Postal Workers Union v. United States,* 925 F.2d 480 (D.C.Cir.1991); and *National Association of Postal Supervisors v. United States,* 944 F.2d 859 (D.C.Cir. 1991) (where insurance benefits to non-postal workers resulted in UBI). The provision of insurance to non-farmers and non-ranchers cannot be a substantial cause of TFB achieving its exempt purpose, and cannot contribute importantly to said purpose.

■ TFB argues in its Response Brief that because agricultural organizations are exempt pursuant to § 501(c)(5), they should follow the developed caselaw with regard to labor organizations. TFB cites *American Postal Workers Union v. United States,* 925 F.2d 480 (D.C.Cir.1991); and *National Association of Postal Supervisors v. United States,* 944 F.2d 859 (D.C.Cir.1991), for the proposition that the insurance programs in question are substantially related to the exempt purpose of the organization.

This Court is of the opinion that TFB's argument is without merit. The two cases cited by TFB are clearly distinguishable from the present case. The insurance programs in those cases were initially developed

---

C.B. 200, for the proposition that the Fifth Circuit applies the same law to both 501(c)(5) agricultural organizations and 501(c)(6) business leagues. In this revenue ruling, an exempt agricultural organization received a fee from an insurance company for providing administrative and management services. The ruling was that such insurance services were not related to the exempt purposes of a 501(c)(5) agricultural organization, and that the income was UBI.

**8.** 26 C.F.R. § 1.501(c)(5)–1 describes agricultural organization objectives to include (i) betterment of the conditions of those engaged in such pursuits, (ii) the improvement of the grade their products, and (iii) the development of a higher degree of efficiency in their respective occupations.

**9.** Casualty sold a *de minimis* amount of workmen's compensation.

solely for postal employees. A postal association is much different from a Farm Bureau, in which many of its members are not farmers or ranchers. As pointed out in the *American Postal Workers Union* case, allowing non-postal employees to pay dues, thereby entitling them to insurance benefits, did amount to taxable UBI on the part of the organization.

■ Additionally, the Fifth Circuit has already gone on record applying the same law to both § 501(c)(5) agricultural organizations and § 501(c)(6) business leagues. In holding that the Louisiana Credit Union League's trade or business of insurance endorsement and promotion was not substantially related to its exempt function, the Court cited Revenue Ruling 60-228, 1960-1 C.B. 200. *Louisiana Credit Union League v. United States*, 693 F.2d 525, 537 (5th Cir.1982). In this revenue ruling, it was held that an agricultural organization, otherwise exempt from federal tax under § 501(a) as an agricultural organization described in § 501(c)(5), is subject to tax under § 511 on the unrelated business income resulting from services rendered to certain insurance companies and from the performance of property management services. While this Court agrees with TFB that it is not *bound* by revenue rulings, this Court does note that such rulings should be viewed favorably by courts. Just as the Fifth Circuit defers to regulations due to the "expertise of the IRS in administering our nation's tax laws," this Court presumes that the Fifth Circuit would likewise give deference to the administrative interpretations of IRS revenue rulings. *Louisiana Credit Union League* at 530 n. 14. Accordingly, Revenue Ruling 60-228, 1960-1 C.B. 200, as well as other applicable rulings cited by the USA, are persuasive and guiding to this Court.

Careful review of the law and the evidence submitted lead this Court to the conclusion that the income received by TFB from Life and Casualty was *not* substantially related to TFB's exempt purpose, and therefore, said income does constitute unrelated business income which is regularly carried on by a trade or business. Therefore, said income is taxable under § 511 unless an exception applies.

## B. COMPENSATION OR ROYALTY?

TFB's primary argument, and Count One of its Second Amended Complaint, is that the income received by TFB from Life and Casualty, and upon which it paid taxes, is *royalty* income primarily derived from the use by Life and Casualty of its name and, in small part, derived from rental of approximately 1700 square feet in its building in Waco.[10]

Section 512(b)(2) of the Internal Revenue Code excludes from UBI taxes "all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income." 26 U.S.C. § 512(b)(2). Neither the Code nor the regulations provide an exact definition of "royalties." The USA cites Revenue Ruling 81-178 for the single best definition of "royalty."

The ruling describes two § 501(c)(5) labor organizations formed to improve the economic and working conditions of its members, who are professional athletes. In *Situation 1*, the organization solicits and negotiates licensing agreements with various businesses. The agreements authorize the businesses to use the organization's trademarks, trade names, service marks, copyrights, and members' names, likenesses, and signatures. Each business will use these things in connection with selling, promoting, and advertising goods or services. The organization has the right to approve the quality of the goods or services. Each business will use these things in connection with selling, promoting, and advertising goods or services. Income from the agreements is either based on a percentage of gross sales or on a flat fee. In *Situation 2*, the agreements are concerned with endorsing products and services and require personal appearances by and interviews with the organization's members.

---

**10.** The Court notes that TFB did not even raise the UBI argument until its 1987 Explanation of Amended Return (attached to Second Amended Complaint as Exhibit D). Its sole argument in the 1984, 1985, and 1986 Explanations of Amended Returns was the royalty exception argument set forth in Count One of the Second Amended Complaint.

Because the payments from the licensing agreements in *Situation 1* are for the use of the organization's trademarks, trade names, service marks, copyrights, and members' names, likenesses, and signatures, these amounts are *royalties* under § 512(b)(2). Because the agreements in *Situation 2* require the personal services of organization members, the payments received are compensation for personal services, *not* royalties under § 512(b)(2).

Based upon this definition of royalties, the USA argues that the "services" TFB rendered to its related insurance companies prevent it from treating the payments as royalties. The USA states that the payments to TFB are compensation for services—not royalties for the use of its name. USA further argues that TFB's allocations indicate that its services generate 57 cents of each dollar of insurance revenue.

TFB, on the other hand, argues that its agreement with Life is "to use its good offices, influence, and prestige in promoting the general welfare of the company....", as well cooperating with Life with respect to carrying on information or education programs, and furnishing facilities for sales directors, including clerical help, and other expenses. *TFB's Response Brief* at 13. TFB's *sole* argument, *critical* to its case, is that TFB and Life considered payments under this agreement to be comprised of two parts: one portion for expense reimbursement to TFB for expenses it incurs in its performance under the agreement, and the second portion to compensate for the good name, prestige, influence, and association of TFB with Life, and the goodwill and benefit to sales of insurance Life attains through that association. *Id.* (from Deposition of Bobby Waters). While the agreement between TFB and Casualty is not written, TFB argues that it consists of primarily the same components. Therefore, TFB believes that a

portion of that income, although UBI, is still not taxable because it is royalty income under § 512(b)(2).

The USA primarily focuses upon the fact that the contract between TFB and Life refers to the income received by TFB as "compensation," and has no reference whatsoever to a "royalty." *USA's Brief* at 12 & Exhibit 4. Therefore, USA believes that this Court should interpret this unambiguous contract as a matter of law. Additionally, USA states that the directors and principals of Life and Casualty have generally referred to the payments in issue as "service fees" during the years in suit. *USA's Brief* Appendix B at 7. Moreover, the calculation of these payments bore no relationship to a royalty payment, but resembled traditional commissions.[11] USA further avers that since Life's agreement and formula for the payments is the same for all state Farm Bureaus, the value of the TFB name was not a factor in calculating the percentages payable. Finally, USA argues that TFB has only recently devised this "dual purpose" argument with regard to its income from the companies in order that it could argue the tax exemption it currently seeks.[12]

While the definition of royalty is clearly a question of law for this Court, a fact issue exists as to whether the parties intended for the income received by TFB to constitute part reimbursement and part royalty. While this Court agrees with the USA that the contract between Life and TFB refers to "compensation" rather than "royalty," said language, by itself, is not sufficient to constitute sufficient summary judgment proof. The USA's argument that the parol evidence rule applies is without merit. The parties should be able to testify as to the application of the written document to the subject matter of the agreement, and to explain its terms, without varying or contradicting the

11. The percentages paid for service fees vary with the different types of life insurance policies—up to 6½ percent for whole life. The more expensive the policy, the higher the percentage rate becomes. *Id.* at 13.

12. For every dollar of income TFB received from Life and Casualty, it has offset 57 cents to every dollar the insurance companies generated as "re-

imbursements." TFB then claims that the 43 cents balance as a nontaxable royalty payment. USA points out that there is no written agreement indicating the "service fees" are part royalty and part reimbursements; this division is merely an attempt by TFB to recharacterize this transaction after the fact. *USA's Brief* at 14.

terms of the agreement. *See Harville Rose Service v. Kellogg Co.,* 448 F.2d 1346, 1350 (5th Cir.1971); *Security Savings Association v. Clifton,* 755 S.W.2d 925 (Tex.App.—Dallas 1988, no writ). Moreover, the agreement between TFB and Casualty was oral; therefore, the parol evidence rule is clearly inapplicable. Genuine issues of material fact exist with regard to said claims, and the arguments by counsel are for the jury, not the Court.

### IV. *Conclusion*

Based upon the foregoing, it is clear that the USA is entitled to partial summary judgment as a matter of law. Particularly, this Court is of the opinion that: (1) the activity from which TFB's income is derived is a "trade or business"; (2) the trade or business is regularly carried on by TFB; and (3) the conduct of the trade or business is *not* substantially related to TFB's tax exempt purpose. Therefore, TFB's income from Life and Casualty constitutes unrelated business income, as a matter of law. The Court is further of the opinion, however, that genuine issues of material fact exist with regard to whether or not said income can be partially characterized as "royalty," as that term is defined in Revenue Ruling 81–178, thereby exempting said portion from taxes pursuant to § 512(b)(2) of the Internal Revenue Code. Accordingly, it is

ORDERED that the United States' Motion for Summary Judgment is **PARTIALLY GRANTED** and **PARTIALLY DENIED** as set forth above. It is further

ORDERED that this case remain set for jury selection and trial on Monday, April 26, 1993, to determine whether or not TFB's income from Life and Casualty can be partially characterized as "royalty," as that term is defined in Revenue Ruling 81–178, thereby exempting a portion from taxes pursuant to § 512(b)(2) of the Internal Revenue Code. It is further

ORDERED that any supplements to the pretrial orders already submitted should be filed on or before Monday, April 19, 1993.