NATIONAL LEAGUE OF POSTMASTERS OF THE UNITED STATES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National League of Postmasters v. Commissioner
Docket No. 8032-93
United States Tax Court
T.C. Memo 1995-205; 1995 Tax Ct. Memo LEXIS 206; 69 T.C.M. (CCH) 2569; May 11, 1995, Filed *206 Decision will be entered under Rule 155. For petitioner: M. J. Mintz and Lawrence D. Garr. For respondent: Dianne I. Crosby. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1987 $ 351,152
1988
339,562
1989
303,511
1990
297,151
The principal issue remaining for decision is whether petitioner had unrelated business taxable income (UBTI) for each year at issue that is subject to tax under section 511(a). [1] We hold that it did. [2]
FINDINGS *207 OF FACT Some of the facts have been stipulated and are so found. Petitioner, the National League of Postmasters of the United States (NLP), is a corporation with its principal office located in Alexandria, Virginia. During all relevant periods, petitioner was exempt from taxation under section 501(a) as a labor organization within the meaning of section 501(c)(5). Petitioner's Purposes
Petitioner's articles of incorporation dated August 1988 and August 1990 (1988 and 1990 articles) set forth the following purposes for which it was organized: 1. Provide a vehicle through which members may assist one another in matters connected with their career employment in the United States Postal Service; 2. Advance the proficiency of personnel in providing postal service promptly, reliably and efficiently to individuals and businesses in all areas of the nation; 3. Consult with the management of the United States Postal Service on policies which concern the welfare, happiness and morale of employees; 4. Improve the conditions under which individual members work, having concern for salaries, hours of employment, working environment, adjustment of grievances and labor *208 disputes; 5. Cooperate with other groups and levels of postal management in the achievement of common goals; 6. Encourage contact among members in social, operational and professional relationships; and 7. Engage in any other activity not inconsistent with the laws of the District of Columbia.
(For convenience, the foregoing purposes will be referred to as purpose 1 through 7, respectively.) The purposes stated in petitioner's 1988 and 1990 articles are identical to the purposes stated in its articles of incorporation dated October 1985 (October 1985 articles) except that the term "working environment" that appears in purpose 4 of the 1988 and 1990 articles was substituted for the term "working conditions" that appeared in purpose 4 of the October 1985 articles. Postmaster and Retired Postmaster Members[3]
As its *209 name and its purposes during all relevant periods indicate, the National League of Postmasters of the United States is an organization that primarily serves the work-related interests of postmasters. A postmaster is the person who is responsible for the mail service in a defined city or geographic area. [4] Prior to the postal reorganization during 1970, postmasters were generally appointed from outside the U.S. Postal Service (Postal Service). Thereafter, postmasters were appointed on the basis of merit from within the ranks of the Postal Service's career Federal employees. As a result, after 1970, becoming a postmaster was a long-term career choice. During all relevant periods, petitioner's articles of incorporation defined an active member as a "person in charge of a post office", [5] and postmasters were eligible to become active members of petitioner. (Such active members are sometimes referred to herein as postmaster members.) *210 During the same periods, any "former Active Member who continues to pay dues and exercises an interest in the LEAGUE" was entitled to become an associate member, and former postmasters who had been active members of petitioner were eligible to become associate members. (Such associate members are sometimes referred to herein as retired postmaster members.) Petitioner *211 collected dues from both active and associate members. During the years at issue, dues for an active member were equal to a percentage of such member's salary, but not less than $ 2 per month. Associate members paid a flat amount of dues each month during those years. Between October 1985 and August 1988, the percentage of salary paid as dues by an active member was raised by 33 1/3 percent. During the years at issue, the average active member paid dues ranging from $ 50 to $ 115 per year. During February 1989, associate member dues were raised from $ 2 per month to $ 3 per month. Since at least August 1988 and throughout the remaining years at issue, active members were required to pay two different special assessments in addition to their dues. The first special assessment, which was imposed in order to assist petitioner in paying off the mortgage on its national headquarters, equaled $ 3 per month. The second special assessment, which was imposed in order to pay for the benefits of the legal services contract discussed below, equaled $ .50 per month. Retired postmaster members were not required to pay the special assessments imposed on postmaster members. During the years *212 at issue, petitioner had the following numbers of active, associate, and retired members [6] and received the following amounts of dues from those members: Active, Associate, and Retired Members
No. of
Annual Year
Members
Range of Dues
Total Dues
1987
21,739
$ 24 - $ 188
$ 1,517,738
1988
22,233
30 -   239
1,890,445
1989
22,226
30 -   244
2,177,491
1990
22,503
30 -   246
2,236,987
*213 During those same years, active and associate member dues covered the period from July 1 through June 30 of the succeeding calendar year. Dues of new active or associate members were prorated to the month of their becoming members. Active members were allowed to authorize their dues to be withheld from their salary. Approximately 90 percent of active members chose that option during the years at issue. The Postmasters Advocate (Advocate), which has been published since at least 1894, is the official publication of the NLP. During the years at issue, it was published 11 times per year and focused on articles designed to enhance or improve the professionalism and working conditions of postmasters. During those years, petitioner's postmaster members and retired postmaster members received the Advocate as part of their dues. During the years at issue, petitioner also provided its active members with opportunities to improve their professional skills through association with other postmasters and from professional improvement programs instituted by petitioner that were conducted through its branch organizations at the State level. Such programs included (1) exchanging information *214 about how the Postal Service wanted situations handled; (2) inviting high level postal or other Government officials to speak at petitioner's meetings; (3) explaining new innovations such as automation; (4) helping to improve public speaking abilities; and (5) conducting sessions on how to prepare for interviews. During the years at issue, the NLP conducted many of its activities and programs at meetings held at the State level. Each State had its own branch organization (State branch). The State branches were required to meet at least once per year, but most branches met more frequently. Each State branch elected officers to operate it and delegates [7] to represent it at petitioner's national convention (described below). The State branches also provided social aspects that allowed postmasters to network with other postmasters and provided training to postmasters on how to become better postmasters. In addition, each State branch had its own newsletter. During the years at issue, approximately 50 percent of each active member's dues was distributed to the State branch to which that member belonged, with the remainder being retained by the national organization. *215 Each State could also create its own affiliated retiree organization in which retired postmaster members could participate. During the years at issue, 10 to 15 percent of each retired postmaster member's dues was distributed by petitioner to the retiree organizations, with the remainder being split between the national organization and State branches. In addition to meetings held at the State branch level, petitioner sponsored an annual national convention. The national convention served as an opportunity for postmasters to meet other postmaster members on a professional and social level. During the years at issue, those delegates eligible to vote at petitioner's annual national convention when that convention was in session comprised the supreme governing body of the NLP (governing body). The governing body established petitioner's policies, elected its national officers, and amended its articles of incorporation and its governing rules. Prior to August 1987, and throughout the years at issue, the following delegates were entitled to vote at the national convention: national officers of petitioner, past presidents who remained active members of petitioner, the president of *216 each State branch organization or that person's proxy, and one additional delegate for every 50 members of a State branch organization. [8] Only an active member could be a delegate from a branch. The national officers elected at petitioner's national convention served on its executive board which was responsible for the NLP's day-to-day operations when the national convention was not in session. During the years at issue, the NLP's code of governing rules (governing rules) provided that its executive board was to "provide a program to assist Postmasters in the protection of their rights of employment and tenure." Pursuant to that directive, petitioner sponsored the adverse action counselors (AAC) program during those years. That program, which had originally been called the deputy director program, had been in place since at least 1974. [9] The AAC program was designed *217 to provide early intervention on behalf of postmasters who were threatened with some form of adverse action. [10] Generally, an AAC became involved with a postmaster's case prior to the time that any official action was taken against the postmaster. The AACs were postmaster members who were selected and trained for the AAC program. Training included input from the Merit Systems Protection Board (MSPB) and the Postal Inspection Service. Active members generally were not charged amounts in addition to their dues for use of an AAC or the AAC program. In addition to direct intervention on behalf of active postmaster members, the AAC program was designed to educate and inform postmasters about preventing potential problems. This was done through *218 programs presented at meetings or conventions held by petitioner and through articles published in the Advocate. To supplement its AAC program, the NLP entered into an agreement dated July 29, 1987 (legal services contract), pursuant to which John P. DiFalco & Associates (DiFalco law firm) was to provide adverse action legal services to members of petitioner. The NLP entered into a similar agreement, dated November 1, 1989, with the DiFalco law firm. [11] The legal services contract obligated the DiFalco law firm to provide the following benefits to petitioner's postmaster members: (1) if fired, free representation before the MSPB; (2) if demoted or suspended, representation before the MSPB at a reduced rate; and (3) if appealing from an adverse decision to the United States Court of Appeals for the Federal Circuit or the United States Supreme Court, representation at a reduced rate. *219 As part of the legal services contract, the DiFalco law firm was also obligated to assist with the AAC program, including training AACs. If a case progressed to any type of hearing, the AACs helped the DiFalco law firm and tried to prevent the affected postmaster from creating additional problems. In addition, John DiFalco of the DiFalco law firm wrote some articles for publication in the Advocate and conducted seminars at various meetings. As noted above, in order to pay for the benefits of the legal services contract, petitioner charged its active postmaster members a special assessment of $ .50 per month in addition to their regular dues. Under the first legal services contract, petitioner was required to remit 67 percent of that assessment to the DiFalco law firm. Under the second legal services contract, petitioner was required to remit that entire special assessment to the DiFalco law firm. During the years at issue, petitioner also conducted a coordinator program that was designed to aid postmasters with problems or grievances that arose in areas other than discipline, e.g., merits, work hours, equipment. The coordinator program was structured in a manner paralleling *220 the Postal Service in that there were five regional coordinators and 74 division coordinators that corresponded to the regions and divisions of the Postal Service. Another activity in which petitioner engaged on behalf of its postmaster members during the years at issue was lobbying. Since at least 1984, petitioner employed a full-time legislative aide and pursued legislative matters of interest to postmasters whether they affected only postmasters or Federal employees in general. Petitioner was also a member of the Fund for Assuring an Independent Retirement (FAIR), which lobbied on behalf of postal and other Federal employees. Postmasters Benefit Plan
Since 1960, petitioner has sponsored the Postmasters Benefit Plan (PBP), which is a health insurance plan under the Federal Employees Health Benefits Program (FEHBP). During the years at issue, the PBP was administered at the NLP's national headquarters. Petitioner allocated portions of its salaries, space, utilities, and other expenses to the administration of that health plan. Under its contract with the Office of Personnel Management (OPM), it received reimbursement for such allocated portions of its administrative *221 expenses (other than for advertising). Under its contract with OPM during the years at issue, petitioner was entitled to the lower of actual costs or a ceiling that it negotiated with OPM. During those years, petitioner's actual costs were less than the negotiated ceiling. During the years at issue, petitioner and OPM negotiated a service charge that was set forth in their contract governing the PBP and that was the only profit element of sponsoring a plan under the FEHBP. A portion of the same charge petitioner received during each of those years was paid to the underwriter of the PBP. The PBP was underwritten by Prudential Insurance Co. of America during 1987 and by Continental Assurance Co. [12] during 1988, 1989, and 1990. Prior to 1978, participation in the PBP was limited *222 to postmaster members and retired postmaster members of petitioner. Beginning on January 1, 1978, the PBP was made available to all Federal employees and retired Federal annuitants eligible for benefits under the FEHBP. However, because the PBP was sponsored by the NLP which was an employee organization, FEHBP rules prohibited petitioner from providing benefits under the PBP to nonmembers. Consequently, those nonpostmaster Federal or postal employees who desired to participate in the PBP during the years at issue were required to become members of petitioner. Once a person eligible to become a member of petitioner paid the requisite dues, that member could participate in the PBP by paying insurance premiums according to the selected level and type of insurance such member designated. To allow nonpostmasters to become members, petitioner created a special class of members to whom it provided prior to August 1987 the sole benefit of access to the PBP in return for their payment of dues. (Members of petitioner other than postmasters, retired postmasters, and officers-in-charge will sometimes be referred to herein as nonpostmaster members.) During the years at issue, most nonpostmasters *223 who enrolled in the PBP and became new members of the NLP did so during the so-called "open season". Throughout the years at issue, open season was a period occurring each fall during which Federal employees and annuitants (including postmasters) were allowed to change from their current health plan under the FEHBP to a different one. Throughout those years, petitioner endeavored to maintain competitive health benefit offerings and advertised the benefits of its PBP. Prior to and during the years at issue, Federal employees and annuitants had the option of enrolling in other Federal Government-wide health plans (viz., Blue Cross and Blue Shield and Aetna) without the necessity of joining an employee organization such as the NLP. [13]
During the open season of each year at issue, the NLP participated in health fairs sponsored by Federal agencies so that it could *224 inform Federal and postal employees of the benefits available under its PBP. During each such year, petitioner also provided input to OPM in order to assist it in preparing a brochure describing the NLP's health plan that was available to all Federal employees and annuitants eligible to enroll in a new health plan. During the years at issue, petitioner received in respect of the PBP the following amounts of total premiums from its members, total service charges from OPM, and its share of such service charges: [14]
Total
Petitioner's
Year
Total Premiums
Service Charges
Share of Service Charges
1987
$ 81,154,274
$ 600,914
$ 165,000
1988
84,857,885
681,500
220,178
1989
94,048,882
676,066
202,236
1990
114,989,985
736,504
222,570
League Benefit Members
Prior to August 1987, petitioner designated its nonpostmaster members as limited benefit members. A limited *225 benefit member was defined in the October 1985 articles as a "person to whom the Executive Board extends the privileges of the Postmasters Benefit Plan." Petitioner amended its articles of incorporation and governing rules during August 1987 (1987 amendments). At that time, the designation of limited benefit member was changed to league benefit member (LBM). [15] *226 LBM was defined by the 1988 and 1990 articles as a "person other than an Active or Associate Member to whom benefits of League membership shall be extended." [16] Thus, subsequent to August 1987, the NLP's articles of incorporation provided for three classes of members: (1) active, (2) associate, and (3) league benefit. Postmasters desiring to participate in the PBP were required to be active members and were not eligible to be LBMs (or, prior to August 1987, limited benefit members). Prior to the 1987 amendments, the only benefit provided to limited benefit members as a result of paying dues to petitioner was the right to participate in the PBP. After the 1987 amendments and throughout the years at issue, in addition to changing the name from limited benefit member to league benefit member and continuing to provide the right to participate in the PBP, petitioner made certain other benefits available to LBMs that were also available to postmaster members (and in some cases to retired postmasters). The legal services contract provided, inter alia, that the DiFalco law firm was to render certain services stated in that contract to all members of petitioner, including LBMs. Specifically, the only services that the DiFalco law firm was to provide LBMs under the legal services contract were free or reduced cost representation before the MSPB, the United States Court of Appeals for the Federal Circuit, and the United States *227 Supreme Court, under the same conditions discussed above with respect to postmaster members. Those benefits under the legal services contract were available to LBMs, other than those covered by binding arbitration, who had been members of petitioner for six continuous months. During the years at issue, some LBMs were employees of the Postal Service other than postmasters, and most full-time nonpostmaster employees of the Postal Service were covered by binding arbitration. In order to cover the cost during the years at issue of including certain services for LBMs under the legal services contract, petitioner paid the DiFalco law firm $ 3.35 to $ 4.00 per LBM for each of those years (regardless whether the LBM was retired or otherwise ineligible for the benefits under that contract). As noted above, prior to and during the years at issue, petitioner lobbied, inter alia, on behalf of and/or in opposition to proposed legislation of interest to all Federal employees, since that legislation affected its postmaster members. Those lobbying efforts relating to proposed legislation affecting all Federal employees were of interest not only to postmasters, but also to LBMs. During 1990 *228 or 1991, petitioner sent a document entitled "Listing of League Issues Which Affect League Benefit Members" to LBMs informing them of certain legislative issues to which its lobbying activities were directed. LBMs could contact petitioner's national headquarters about legislative issues as well as other concerns. The NLP made the following additional benefits [17] that were offered to postmaster members and retired postmaster members available to LBMs: (1) A prescription eyewear program that allowed members to purchase frames from a mail-order catalog; (2) a long-term care program that allowed members to purchase insurance to cover the costs associated with nursing home care; (3) the Quest International Travel Club program that allowed members to join the Quest travel club at a discount rate; and (4) a VISA Gold Card program that allowed members to receive a Gold Card with no annual fee for the first year. (These additional benefits will sometimes be collectively referred to herein as miscellaneous benefits.) All of the miscellaneous benefits were designed to produce revenues for petitioner if administered properly, and some of them did produce revenues for petitioner. *229 As part of the 1987 amendments, in addition to extending certain benefits to LBMs, petitioner decided to give them certain voting rights within the organization. To accomplish that goal, petitioner created the position of LBM representative. Except for the first LBM representative, who was appointed by petitioner's executive board during the fall of 1987 and who served until August 1989, the LBM representative was to be an elected representative of the LBMs to serve on petitioner's executive board. Prior to the 1987 amendments, the executive board consisted of nine members, all of whom were active postmaster members of petitioner and were elected at the national convention. When the LBM representative position was created, petitioner expanded the size of its executive board from nine to 10 members and raised by one the number of executive board member votes needed to carry certain special actions by, and to constitute a quorum of, that board. The LBM representative was allowed to voice his concerns and vote on any issue before the executive board. The LBM representative was also entitled to serve on, and act as chairperson of, committees of the NLP, such as the Oversight Committee *230 of the PBP. In addition, the LBM representative was one of approximately 500 voting delegates at the national convention. [18] Like every other member of the executive board and every voting delegate, the LBM representative was entitled to address the national convention. According to petitioner's 1988 and 1990 articles and its governing rules in effect for the years at issue, except for the first LBM representative, the LBM representative was to be elected by a mail vote of all LBMs and was to serve a two-year term. During April 1989, petitioner's president sent out a "Call for Nomination" for the position of LBM representative. All LBMs were notified that they were eligible to run for the position. Ten candidates were nominated. Petitioner sent information on all of those candidates and official ballots to those LBMs in good standing. In August 1989, *231 Gerald F. Merna (Mr. Merna) became the first elected LBM representative. After he served a two-year term, Mr. Merna was reelected to that position during August 1991. However, he resigned in late 1991. While he was the LBM representative from August 1989 through late 1991, Mr. Merna attended, and addressed, all three of petitioner's annual national conventions that were held during that period. In addition, while serving as the LBM representative, he attended numerous executive board meetings and attended some State conventions as the representative from the executive board who was designated to swear in the elected officers of the various State branch organizations. Subsequent to the 1987 amendments, petitioner began sending a newsletter to LBMs. During the fall of 1988, the LBM representative instituted a newsletter called the League Benefit Member News (LBM News). Two editions of the newsletter were issued in November 1988 and October 1989. The newsletter's name was thereafter changed to The Insider and was sent to all LBMs and other members who participated in the PBP. Beginning with the December 1989 issue, The Insider was mailed on a quarterly basis. Petitioner used *232 the newsletters to communicate with LBMs about the benefits available to LBMs. Petitioner also sent various letters to LBMs encouraging them to remain LBMs even if they chose not to participate in the PBP. During the years at issue, petitioner did not solicit or encourage LBMs to participate in the State branches or the State retiree organizations. Nor were LBMs entitled to vote for, or serve as, State branch officers or delegates. In fact, petitioner's national organization kept 100 percent of all dues paid by LBMs, rather than distributing some percentage to the State branches, as was done in the case of both postmaster and retired postmaster members. [19]
Although petitioner allowed LBMs to attend its national convention, during the years at issue, it did not encourage them to do so. Although some LBMs other than the LBM representative attended at least some of the national conventions held during those years, the record does not *233 disclose how many attended. In addition, no LBM other than the LBM representative was entitled to be a voting delegate at the national convention. Although during the years at issue all other national officers were elected at the national convention, the LBM representative was elected through a mail vote. During the years at issue, petitioner had the following numbers of limited benefit and/or league benefit members and received the following amounts of dues from them: Limited and/or League Benefit Members
No. of
Year
Members
Annual Dues
Total Dues [20]
1987
30,389
$ 25
$ 677,484
1988
26,879
35
754,039
1989
23,237
35
687,369
1990
21,885
35
637,320
During 1987, each limited benefit member and/or LBM paid dues of $ 25 for the year. During each of the years 1988 *234 through 1990, each LBM paid dues of $ 35 per year. During the years at issue, dues for LBMs (and/or limited benefit members for 1987) covered the period from January 1 through December 31 of each calendar year and were not prorated regardless of the month they became members. LBMs could not authorize their dues to be withheld from their salary. Prior Tax Audit
Prior to the years at issue, respondent audited petitioner's tax years 1980 through 1983. As a result of the participation by nonpostmasters in the PBP, respondent proposed revoking petitioner's tax-exempt status and, in the alternative, taxing the dues of limited benefit members as UBTI. Petitioner settled that audit in late December 1986, conceded the UBTI issue, and paid all taxes owed to the Federal and State Governments. Petitioner mortgaged its national headquarters in order to borrow the money to pay those taxes. OPINION The principal issue remaining for decision [21] is whether, as determined by respondent in the notice of deficiency (notice), the dues collected by petitioner from LBMs are includible in petitioner's unrelated business taxable income as defined in section 512(a)(1) for each of the years *235 1987 through 1990. [22] Petitioner bears the burden of proving that respondent's determinations in the notice are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *236 I. General Rules
Section 501(a), in general, exempts from tax certain entities described in section 501(c), including labor organizations described in section 501(c)(5). However, section 511(a) imposes a tax for each taxable year on the unrelated business taxable income of most organizations that are otherwise exempt from tax under section 501(a). The primary purpose for enacting the unrelated business income tax (UBIT) was to prevent unfair competition by exempt organizations that provide goods or services in direct competition with nonexempt entities. United States v. American College of Physicians, 475 U.S. 834, 837-838 (1986). The term "unrelated business taxable income" is defined in section 512(a)(1) to mean "the gross income derived by any organization from any unrelated trade or business * * * regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business". The term "unrelated trade or business" means "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use *237 it makes of the profits derived) to the exercise or performance by such organization of its * * * purpose or function constituting the basis for its exemption under section 501". Sec. 513(a). Thus, income generated by an activity is includible in UBTI within the meaning of section 511(a) if (1) the activity constitutes a trade or business; (2) the activity is regularly carried on; and (3) the conduct of the activity is not substantially related to the carrying on of the organization's tax-exempt purposes (other than through the production of income). United States v. American Bar Endowment, 477 U.S. 105, 109-110 (1986); United States v. American College of Physicians, supra at 838-839; Steamship Trade Association v. Commissioner, 757 F.2d 1494, 1496-1497 (4th Cir. 1985), affg. 81 T.C. 303 (1983); West Virginia State Medical Association v. Commissioner, 91 T.C. 651, 655 (1988), affd. 882 F.2d 123 (4th Cir. 1989). During the years at issue, petitioner solicited persons to become league benefit members of *238 its organization and collected dues from the LBMs in return for a bundle of benefits it made available to them (e.g., access to the PBP, legal services contract, certain voting rights). (Hereinafter, that activity of the NLP will be referred to as the LBM activity.) In addition to the service fee petitioner received as a result of the participation of nonpostmaster members in the PBP, petitioner's LBM activity generated dues that resulted in significant net revenues during the years at issue. [23]
Through stipulations and concessions, petitioner agrees that its LBM activity was a trade or business that was regularly carried on during the years *239 at issue. Consequently, the only issue we must decide in determining whether petitioner had UBTI for those years from the dues it received for its LBM activity is whether the conduct of that activity was substantially related (aside from its need for income or funds or its use of the profits derived from that activity) to the exercise or performance by petitioner of its tax-exempt purposes. [24]
II. "Substantially Related" Test
Section 1.513-1(d)(2), Income Tax Regs., states in pertinent part: Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related" * * * only if the causal relationship is a substantial one. * * * [Emphasis added.]
In other words, in order for the conduct of a trade or business from which gross income is obtained to be substantially related *240 to the carrying on of purposes for which exemption is granted, the activity from which the gross income is derived must contribute importantly to the accomplishment of those purposes. Sec. 1.513-1(d)(2), Income Tax Regs.Whether that activity contributes importantly to the accomplishment of any of the organization's exempt purposes depends in each case upon the facts and circumstances involved. Id.
The Supreme Court has indicated that, in determining whether a particular activity contributes importantly to the accomplishment of an organization's exempt purposes, the focus should be on the manner in which the organization conducts the activity. United States v. American College of Physicians, 475 U.S. at 848-849. See Independent Ins. Agents of Huntsville v. Commissioner, 998 F.2d 898, 902 (11th Cir. 1993), affg. T.C. Memo. 1992-163; Veterans of Foreign Wars, Dept. of Michigan v. Commissioner, 89 T.C. 7, 38 (1987). In so concluding in the American College of Physicians case, the Supreme Court relied on both section 513(a) and section 1.513-1(d)(2), Income *241 Tax Regs., which emphasize that the conduct of the activity must be substantially related to the carrying on of the exempt purposes of the organization. United States v. American College of Physicians, supra at 849; see also Shiloh Youth Revival Centers v. Commissioner, 88 T.C. 565, 575 (1987). Accordingly, in deciding whether petitioner's LBM activity during the years at issue was substantially related to the carrying on of any of its exempt purposes, our focus will be on the manner in which it conducted that activity. Specifically, we shall determine whether the manner in which petitioner conducted its LBM activity during those years evinces its intention to use that activity for the purpose of contributing importantly to the accomplishment of any of its exempt purposes or whether that manner manifests its intention to raise revenue. [25] See Illinois Association of Professional Ins. Agents v. Commissioner, 801 F.2d 987, 994 (7th Cir. 1986), affg. T.C. Memo. 1985-105; see also United States v. American College of Physicians, supra at 848-849; *242 Independent Ins. Agents of Huntsville v. Commissioner, supra at 902. We therefore disagree with petitioner's position (discussed below) that the Court's main focus in the present case should be to determine whether the LBMs were bona fide members of the NLP during the years at issue. *243 III. Petitioner's Position
As we understand petitioner's position, if the Court were to find that during the years at issue LBMs were bona fide members of the NLP, no further inquiry would be needed to hold that the dues it received during those years from LBMs are not includible in its UBTI. This is because, according to petitioner, the NLP's making health insurance, as well as other benefits, available to league benefit members during the years at issue would be substantially related to the accomplishment of its exempt purposes under the authority of Rev. Rul. 62-17, 1962-1 C.B. 87, National Association of Postal Supervisors v. United States, 944 F.2d 859 (Fed. Cir. 1991), and American Postal Workers Union v. United States, 925 F.2d 480 (D.C. Cir. 1991). Petitioner's reliance on Rev. Rul. 62-17 and the National Association of Postal Supervisors and American Postal Workers Union cases is misplaced and its position is misguided. In Rev. Rul. 62-17, supra, respondent ruled *244 that the payment by a labor organization of health and other similar benefits to its individual members with funds contributed by its members would not preclude exemption of that organization as a labor organization under section 501(c)(5), provided that such benefits are paid under a plan that has as its objective the betterment of the conditions of its members. Thus, Rev. Rul. 62-17, supra, specifically requires an examination of whether the provision of health and similar benefits to a labor union's members is done pursuant to a plan that has as its purpose bettering the conditions of those members. [26] That ruling is therefore wholly consistent with, and does not alter, the application of the "substantially related" test of section 513(a) and section 1.513-1(d)(2), Income Tax Regs., as elaborated upon by various courts.
*245 In National Association of Postal Supervisors and American Postal Workers Union, two Courts of Appeals found that the provision of health insurance to those persons who were known as limited members of the labor organizations there involved and who were not "members in any other sense" was not substantially related to the carrying on of those organizations' exempt purposes. [27]National Association of Postal Supervisors v. United States, supra at 861; American Postal Workers Union v. United States, supra at 483. Consequently, both courts held that the dues paid by the limited members to gain access to the respective health plans of each labor organization in question were includible in UBTI. Id. Contrary to petitioner's assertions, those courts did not conclude that the limited members involved in those two cases were not bona fide members of the organizations in question. Rather, they simply concluded that the limited members were not members of such organizations for any purpose other than receiving the health insurance in question. *246 Petitioner apparently reads National Association of Postal Supervisors v. United States, supra, and American Postal Workers Union v. United States, supra, as indicating that being a member in some other sense will automatically allow a labor organization to provide health insurance to such a member without being subject to UBIT. [28] We disagree. Neither of those cases holds, or can fairly be read to conclude, that a labor organization's provision of health insurance to persons who are members in some other sense will necessarily be substantially related to the accomplishment of its exempt purposes within the meaning of section 513(a), section 1.513-1(d)(2), Income Tax Regs., and the cases construing those provisions. *247 Indeed, the United States Court of Appeals for the District of Columbia Circuit summarized its holding as follows: we simply hold that provision of insurance benefits to persons who are not members in any other sense cannot be substantially related to a union's tax-exempt purposes. [American Postal Workers Union v. United States, supra at 483.]
In National Association of Postal Supervisors v. United States, supra at 861, the Court of Appeals for the Federal Circuit quoted with approval the above holding of the Court of Appeals for the District of Columbia Circuit. We do not believe that either Court of Appeals was suggesting that the "substantially related" test set forth in the pertinent Code and regulatory provisions does not apply to labor organizations. To restate our inquiry, it is to determine whether petitioner's LBM activity during the years at issue was substantially related to the accomplishment of any of the purposes for which it was granted exemption. In resolving that issue, we shall focus on whether the manner in which petitioner conducted the LBM activity during the years at issue *248 evinces its intention to contribute importantly to the carrying on of any of those purposes. See sec. 513(a); United States v. American College of Physicians, 475 U.S. at 848; Illinois Association of Professional Ins. Agents v. Commissioner, 801 F.2d at 994; Independent Ins. Agents of Huntsville v. Commissioner, 998 F.2d at 902; sec. 1.513-1(d)(2), Income Tax Regs.
IV. Application of "Substantially Related" Test to Petitioner
A. Petitioner's Exempt Purposes
The purposes stated in the NLP's articles of incorporation during the relevant periods presumably form the basis on which it was determined to be exempt from tax. We shall therefore examine those purposes. See American Postal Workers Union v. United States, 925 F.2d at 482. Petitioner's 1988 and 1990 articles set forth the following purposes for which it was organized: 1. Provide a vehicle through which members may assist one another in matters connected with their career employment in the United States Postal Service; 2. Advance the proficiency of personnel in providing postal *249 service promptly, reliably and efficiently to individuals and businesses in all areas of the nation; 3. Consult with the management of the United States Postal Service on policies which concern the welfare, happiness and morale of employees; 4. Improve the conditions under which individual members work, having concern for salaries, hours of employment, working environment, adjustment of grievances and labor disputes; 5. Cooperate with other groups and levels of postal management in the achievement of common goals; 6. Encourage contact among members in social, operational and professional relationships; and 7. Engage in any other activity not inconsistent with the laws of the District of Columbia.
Except for three of the foregoing purposes (i.e., purposes 4, 6, and 7), all of them deal exclusively with postmasters or other personnel in the Postal Service. Petitioner does not argue that during the years at issue its LBM activity was substantially related to the accomplishment of any of its exempt purposes except purpose 4 and purpose 6. [29] We shall deal first with petitioner's argument as it relates to purpose 6 and then with its argument as it relates to purpose *250 4. B. Purpose 6
Petitioner contends that during the years at issue it encouraged contact among its members, including LBMs, for social, operational, and professional purposes as provided in purpose 6. [30] The record in this case belies that contention. On that record, we find that petitioner did not attempt to encourage contact, whether for social, operational, or professional purposes, among or with LBMs during the years at issue. Petitioner did not encourage LBMs to participate in meetings conducted by the State branches or their affiliated retiree organizations and presented no evidence to suggest that LBMs did in fact participate in those organizations. [31] Nor did it present any evidence showing that it sponsored similar State or local branch *251 organizations designed for LBMs. Although petitioner allowed LBMs to attend its national convention, *252 it presented no evidence to establish that it encouraged LBMs to participate in the national convention during the years at issue. [32] Furthermore, with the exception of the LBM representative, LBMs were not entitled to vote at the national convention. Although all other national officers were elected at the national convention, the LBM representative was elected through a mail vote. While apparently some LBMs attended one or more national conventions during the years at issue, petitioner presented no evidence to show how many LBMs participated, or in what ways they participated, in those conventions. On the present record, we find that petitioner failed to show that its LBM activity during the years at issue was conducted in a manner *253 that evinces its intention to contribute importantly to the accomplishment of its purpose 6 or otherwise was substantially related to the carrying on of that purpose. C. Purpose 4
During the relevant period, pursuant to purpose 4, petitioner was organized and was to be operated in order to "Improve the conditions under which individual members work, having concern for salaries, hours of employment, working environment, adjustment of grievances and labor disputes". (Purpose 4 will sometimes be described herein as a purpose of improving the working conditions of petitioner's members.) Since that purpose is not limited on its face to postmasters or to those presently or formerly employed by the Postal Service, we shall assume arguendo that it should be construed to cover not only such persons. [33]
*254 Presumably because of petitioner's misplaced reliance on Rev. Rul. 62-17, 1962-1 C.B. 87, National Association of Postal Supervisors v. United States, 944 F.2d 859 (Fed. Cir. 1991), and American Postal Workers Union v. United States, 925 F.2d 480 (D.C. Cir. 1991), the thrust of its position and of the various arguments in support of that position appears designed to prove that making certain rights and benefits available to LBMs, including limited voting rights, communications with LBMs, and the miscellaneous benefits, made them bona fide members of the NLP during the years at issue and that therefore making certain of those benefits available to LBMs during those years (viz., the PBP, the legal services contract, and its lobbying efforts) was substantially related to the accomplishment of its purpose 4 within the meaning of the applicable law because labor organizations typically make those kinds of benefits available to their members. As stated previously, petitioner's position is misguided. Even assuming arguendo that LBMs were bona fide members of the NLP during the years *255 at issue, as discussed above, it does not necessarily follow that petitioner's LBM activity during those years was substantially related to the carrying on of its purpose 4 within the meaning of section 513(a), section 1.513-1(d)(2), Income Tax Regs., and the decisions construing those provisions. Despite the deficiencies that we have found in petitioner's arguments, we nonetheless shall analyze each of the various rights and benefits available to LBMs during the years at issue in order to determine whether its LBM activity was substantially related to the accomplishment of its purpose 4. [34] We shall begin by analyzing certain of the rights and benefits (viz., limited voting rights, communications with LBMs, and the miscellaneous benefits) that petitioner argues made the LBMs bona fide members of the NLP during the years at issue, but that petitioner does not argue were substantially related to the carrying on of its purpose 4 during those years. We shall then turn to an analysis of those benefits (viz., the PBP, the legal services contract, and its lobbying efforts) that petitioner argues were substantially related to the accomplishment of its purpose 4 during the years at issue *256 because they are the type of benefits that labor organizations typically make available to their members. *257 1. Certain Rights and Benefits that Petitioner Argues Made LBMs Bona Fide Members of the NLP
a. Limited Voting Rights
While granting LBMs certain limited voting rights might arguably be relied upon to establish that petitioner's LBM activity was substantially related to improving the working conditions of LBMs by, for example, causing petitioner to listen and respond to their work-related problems, petitioner makes no such argument. Even if petitioner had advanced such an argument, the record in this case would not have allowed us to sustain it. The right of LBMs to vote was limited. Although they constituted over one-half of the total dues-paying members of petitioner during three of the four years at issue, LBMs were never given more than one out of 10 votes on the executive board or one out of approximately 500 votes at the national convention. As a result, as admitted by Ronald D. Swisher (Mr. Swisher), a former president of petitioner, LBMs could not even control issues affecting only LBMs. It is also noteworthy that at the time petitioner created the position of LBM representative it raised by one the number of executive board members needed to approve certain *258 actions and to constitute a quorum, thereby effectively diluting the LBM vote. Moreover, LBMs were not given the right to vote for, or serve as, State branch officers during the years at issue or to serve as delegates from a State branch at the national convention. Furthermore, the first LBM representative was appointed by the executive board. The first elected LBM representative did not even take office until August 1989. Consequently, for almost three of the four years at issue, LBMs did not even have the ability to exercise their limited voting rights in petitioner. On the instant record, we find that petitioner failed to prove that providing certain limited voting rights to LBMs during the years at issue establishes that petitioner conducted its LBM activity in a manner that evinces its intention to contribute importantly to improving the working conditions of LBMs or otherwise was substantially related to the accomplishment of that purpose. [35]
*259 b. Communications with LBMs
While petitioner's communications with LBMs might arguably show that its LBM activity was substantially related to improving the working conditions of LBMs, petitioner does not advance any such argument. Even if petitioner had made such an argument, the instant record would not have permitted us to sustain it. During the years at issue, LBMs could contact petitioner to discuss legislative issues as well as other matters. However, petitioner has not demonstrated that the concerns of any LBMs who called its office or wrote it letters were ever considered or dealt with in any substantial or meaningful way. In fact, an examination of the minutes of petitioner's executive board meetings during the years at issue shows that petitioner focused on LBMs only when it created the LBM status in connection with the 1987 amendments, when it considered raising their dues, and when an LBM representative was elected or appointed. [36]
*260 In addition to allowing LBMs to contact its national organization during the years at issue, petitioner initiated communications with LBMs through newsletters and several other letters. However, both the LBM News, which was issued once during each of the years 1988 and 1989, and The Insider, which was issued quarterly beginning in December 1989, were used primarily as advertisements for the PBP and the other benefits available to LBMs. See Illinois Association of Professional Ins. Agents v. Commissioner, 801 F.2d at 995. Similarly, petitioner's letters to former enrollees in the PBP encouraging them to remain LBMs even though they decided to drop their enrollment in the PBP appear to have been little more than solicitations for selling league benefit memberships in petitioner to those nonpostmasters interested in the legal services contract and/or the miscellaneous benefits available to LBMs. Thus, it appears that the manner in which petitioner conducted its communications with LBMs during the years at issue manifests its intention to use the LBM activity to raise revenue. On the instant record, we find that petitioner failed to prove that its *261 communications with LBMs were conducted during the years at issue in a manner that evinces its intention to contribute importantly to improving the working conditions of LBMs or otherwise were substantially related to the accomplishment of that purpose. c. Miscellaneous Benefits
Petitioner made the following miscellaneous benefits available to LBMs: (1) A prescription eyewear program that allowed members to purchase frames from a mail-order catalog; (2) a long-term care program that allowed members to purchase insurance to cover the costs associated with nursing home care; (3) the Quest International Travel Club program that allowed members to join the Quest travel club at a discount rate; and (4) a VISA Gold Card program that allowed members to receive a Gold Card with no annual fee for the first year. Petitioner does not argue, nor would the record support a conclusion, that the miscellaneous benefits made available to LBMs were substantially related to the carrying on of its purpose 4. In examining the circumstances surrounding petitioner's making such miscellaneous benefits available to LBMs, it appears to us, and petitioner has not demonstrated to the contrary, that petitioner's *262 intention for offering such benefits was to generate revenue. All of the miscellaneous benefit programs, like the PBP, were designed, if administered properly, to produce revenues for petitioner in addition to the dues it collected from LBMs, and some of them did produce revenues for petitioner. On the instant record, we find that petitioner failed to prove that the miscellaneous benefit programs made available to LBMs during the years at issue were conducted in a manner that evinces its intention to contribute importantly to improving the working conditions of LBMs or otherwise were substantially related to the accomplishment of that purpose. 2. Benefits that Petitioner Argues Were Substantially Related to the Accomplishment of Purpose 4
a. The PBP
Petitioner argues that the PBP was substantially related to the carrying on of its purpose 4 during the years at issue because LBMs were bona fide members of the NLP and labor organizations typically provide health insurance to their members. As discussed above, petitioner's argument misses the mark. Petitioner must show that making the PBP available to league benefit members was substantially related to improving the *263 working conditions of LBMs. It has failed to do so on the present record. Our examination of the record suggests that, with respect to LBMs, petitioner conducted the PBP during the years at issue in a manner that was intended to raise revenue. Petitioner appears to have marketed the PBP plan to LBMs in a commercial manner designed to sell its health insurance plan. During the open season each fall, petitioner participated in health fairs and other types of advertisements to encourage persons eligible to become LBMs to switch to the PBP. Also, like every other sponsor of a FEHBP health plan, petitioner, in conjunction with OPM, produced a brochure each year regarding the costs and benefits of its plan. Petitioner presented no evidence to show that the way in which it marketed its plan to LBMs during the years at issue was different from the methods used by any other sponsor of FEHBP health plans, many of whom were for-profit entities. It is also noteworthy that the PBP was open to all retired Federal annuitants eligible for benefits under the FEHBP. Since those retirees were not currently working, it is difficult to see how making health insurance available to retired LBMs who *264 had not been members in the past could be said to have contributed importantly to improving the working conditions of those LBMs. [37] Rather, it suggests to us that petitioner conducted the PBP with respect to LBMs in a manner designed to raise revenue. In fact, petitioner did generate significant net revenues during the years at issue from the participation of LBMs in the PBP. On the instant record, we find that petitioner failed to prove that the manner in which it conducted the PBP with respect to LBMs during the years at issue evinces its intention to contribute importantly to improving their working conditions. Nor did *265 it otherwise establish that making the PBP available to LBMs during those years was substantially related to the carrying on of that purpose. b. Legal Services Contract
The legal services contract appears to be the type of benefit that might arguably contribute importantly to improving the working conditions of LBMs. Petitioner argues on brief: It is hard to envision matters more related to the tax-exempt purposes of a section 501(c)(5) labor organization than the institution of effective programs aimed at preserving its member-employees' jobs, employment status, and earnings.
Once again, petitioner fails to realize, or refuses to acknowledge, that it must demonstrate that making the legal services contract available to its league benefit members contributed importantly to improving the working conditions of those LBMs. It has not done so on the present record. In fact, the benefits of the legal services contract were not even available to all LBMs. That contract did not cover any LBM who was subject to binding arbitration. It is not clear what percentage of LBMs were covered by binding arbitration; however, at least some of petitioner's LBMs were postal service *266 employees other than postmasters, and most full-time postal service employees were subject to binding arbitration during the years at issue. We also note that the persons eligible to become LBMs included all retired Federal annuitants eligible for benefits under the FEHBP. Although the record does not disclose how many LBMs were retirees, any LBM who was a retiree would not have received any benefit from the legal services contract. [38]
Since petitioner did not prove how many LBMs were not covered by binding arbitration or were not *267 retired, petitioner failed to prove how many LBMs were eligible to receive benefits under the legal services contract. Without evidence in the record showing that a substantial number of LBMs were eligible for benefits under the legal services contract, we are unable to find that petitioner conducted that program in a manner designed to contribute importantly to improving the working conditions of LBMs. In a brochure describing the legal services contract, petitioner claimed that the mere fact that an employee was covered by that contract would discourage his or her employer from taking adverse action against that employee. [39] Petitioner presented no corroborating evidence, and did not persuade us, that its claim regarding the effect of the legal services contract on employers was warranted. The instant record does not show that an employer would even know that a particular employee was covered by the legal services contract or that an employer would treat an employee differently even if such employer knew about the benefits of the legal services contract. *268 Petitioner also contends that, as part of the legal services contract, it provided LBMs with access to the AAC and coordinator programs that it conducted to benefit its postmaster members. The AAC program sponsored by petitioner was designed to aid postmaster members with disciplinary problems. Through that program, in an attempt to avoid threatened adverse action, AACs (i.e., other postmaster members trained by petitioner to serve in that capacity) were available to represent postmasters threatened with such adverse action in discussions with their employers. The program was also designed to instruct postmasters on how to avoid potential adverse actions. That was done through articles written in the Advocate and programs presented at both the State branch meetings and the national convention. The coordinator program, which was set up along the same regional and divisional lines as the Postal Service, was a similar arrangement designed to help postmasters with other grievances arising out of the employer-employee relationship. The record in this case shows that although AACs or coordinators may have occasionally intervened on behalf of certain LBMs during the years at issue, *269 any such intervention was ad hoc. Moreover, as admitted by petitioner, petitioner did not formally inform LBMs that the AAC and coordinator programs were available to them as a member benefit. [40] Petitioner did not call as a witness a single LBM who had sought help from an AAC or who had been helped by an AAC during the years at issue. Nor did it maintain any records of instances in which LBMs were aided by AACs. [41]
*270 On the instant record, we find that petitioner failed to prove that during the years at issue either the AAC program or the coordinator program was meaningfully available to LBMs in return for their payment of dues or that, even assuming arguendo those programs were meaningfully available to LBMs during those years, petitioner adequately communicated the availability of those programs to LBMs. We further find that petitioner failed to prove that the manner in which it made the legal services contract available to LBMs during the years at issue evinces its intention to contribute importantly to improving the working conditions of LBMs or that making the legal services contract available to LBMs during those years otherwise was substantially related to the carrying on of that purpose. c. Lobbying Efforts
Petitioner argues that its legislative activities during the years at issue were substantially related to the carrying on of its purpose 4. Again, that argument is off target. Petitioner must establish that its legislative efforts in respect of LBMs were substantially related to improving the working conditions of LBMs. It has failed to do so on the present record. Although *271 petitioner did engage during the years at issue in some lobbying directed at proposed legislation of concern to all Federal employees, including both postmasters and LBMs, petitioner failed to offer any evidence to demonstrate that it actually represented to others that it was representing LBMs, as opposed to just postmasters, when conducting its lobbying activity. It also failed to establish that it considered the interests of LBMs when deciding what type of action it would take with respect to proposed legislation it deemed of interest to all Federal employees. Accordingly, it appears to us that any benefit LBMs received from petitioner's lobbying efforts regarding proposed legislation of interest to all Federal employees was incidental to petitioner's lobbying on behalf of postmasters. See National Association of Postal Supervisors v. United States, 21 Cl. Ct. 310, 314 (1990), affd. 944 F.2d 859 (Fed. Cir. 1991). In support of its position regarding the lobbying efforts it contends it undertook on behalf of LBMs, petitioner presented two documents entitled "Listing of League Issues Which Affect League Benefit Members" *272 (legislative listings). Those listings identify certain bills (at least most of which appear to affect postmasters as well as other Federal employees) and give a brief description of each such bill. One of those listings (secondary legislative listing) contains only a few items of legislation, all of which are also listed on the other listing (primary legislative listing). Those legislative listings do not show, and petitioner has not otherwise established, how and whether petitioner conducted its legislative activity on behalf of LBMs with respect to any or all of the bills identified in those listings. [42]
*273 We also note that the secondary legislative listing appears to have been mailed to LBMs, but the primary legislative listing apparently was not sent to them. If petitioner in fact intended to inform LBMs of proposed legislation of interest to them and to seek their input on what actions to take with respect to that legislation, it seems to us that petitioner would have sent the primary legislative listing, rather than the secondary legislative listing, to LBMs. In addition to its lobbying efforts in opposition to or on behalf of proposed legislation of interest to all Federal employees including postmasters, petitioner contends that it engaged in legislative efforts that had no impact on postmasters. Mr. Swisher testified that he "believed while * * * [he] was president there were a couple of issues that Mr. Bowley [the full-time legislative aide for the NLP] worked on that did not even affect the postmasters." We are unwilling to rely on such general and vague testimony to support petitioner's position that some of its lobbying efforts were focused on issues not affecting postmasters. In a further attempt to support its argument that it lobbied on behalf of LBMs when postmasters *274 were not impacted, petitioner identifies four bills on the legislative listings that it claims did not have any effect on postmasters and asks us to take judicial notice of that fact. Assuming arguendo that we could appropriately take judicial notice that the provisions of the bills identified by petitioner, on their face, impact only nonpostmasters, it does not follow that petitioner's activities with respect to those bills were not intended to benefit postmasters. This is because we cannot determine solely from examining those bills whether or not they had any potential impact on postmasters. For example, petitioner argues that it lobbied in respect of a bill that granted to certain Federal employees other than postmasters the right to appeal adverse actions to the MSPB. According to petitioner, postmasters were excluded from that bill because they already were entitled to that right. By favoring the right of other Federal employees to appeal to the MSPB, petitioner may have been attempting to ensure that Congress did not take that right away from postmasters, rather than attempting to contribute importantly to improving the working conditions of LBMs. In addition, the record *275 does not disclose the nature or extent of petitioner's efforts on behalf of LBMs with respect to the bills it identified on the legislative listings as impacting only nonpostmasters. On the present record, we find that petitioner failed to prove that it conducted its lobbying efforts during the years at issue in a manner that evinces its intention to contribute importantly to improving the working conditions of LBMs or that its lobbying efforts otherwise were substantially related to the carrying on of that purpose. V. Conclusion
We have examined all of the rights and benefits offered by petitioner to LBMs in return for their payment of dues both separately and in the aggregate, as well as the manner in which petitioner provided such rights and benefits. [43] *277 Based on our review of the entire record in this case, we find that petitioner failed to prove that the manner in which it conducted its LBM activity during the years at issue evinces its intention to contribute importantly to any purpose for which it was granted exemption (other than through the production of income). We further find that petitioner did not otherwise establish that its LBM activity during those years *276 was substantially related to the carrying on of any of those purposes. From our examination of the record, it appears to us that petitioner conducted its LBM activity during the years at issue in a manner that manifests its intention to raise revenue to support the NLP's core purpose and function of aiding postmasters with their work-related problems and to repay the mortgage loan on its national headquarters that it incurred in order to pay the Federal and State taxes it owed as a result of settling the audit of its 1980 through 1983 tax years that resulted in UBIT. It seems to us that the ends achieved by petitioner during the years at issue as a result of its LBM activity are an objective indication of its intention in conducting that activity. During those years, petitioner generated substantial net revenues through the sale of LBM memberships and the participation of nonpostmasters in the PBP. [44]
We sustain respondent's determination that petitioner had unrelated business taxable income for each of the years at issue as a result of receiving dues from LBMs during those years. Consequently, pursuant to the parties' stipulation, the service charge petitioner received during each of those years that is attributable to the participation of the LBMs in the PBP also is includible in its unrelated business taxable income for each such year. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner raised a subsidiary issue alleging an overpayment of tax for 1987 that we would have to address only if we were to hold for petitioner on the UBTI issue. Since we hold against petitioner on the UBTI issue, we shall not consider that subsidiary issue.↩
3. As used herein, the term "member" is used to refer to a person who has paid dues to petitioner in return for certain benefits and/or services it made available to such member.↩
4. There are different grades or levels of postmasters for which postmasters compete.↩
5. In addition to postmasters, persons in charge of a post office included persons designated as officers-in-charge. An officer-in-charge is, in essence, a temporary postmaster who runs a particular post office until a postmaster is appointed to fill the job. Although officers-in-charge could be members of petitioner, it is unclear from the record whether petitioner treated officers-in-charge as active or associate members. Since officers-in-charge were not a major component of petitioner's activities, and since no aspect of petitioner's activities with respect to officers-in-charge is at issue, officers-in-charge generally will not be discussed herein.↩
6. There appears to be an inconsistency between petitioner's articles of incorporation and its actual practice. Under its articles during all relevant periods, an associate member was defined as a "former active member". However, although it is not altogether clear, see supra note 5, petitioner seems to have considered officers-in-charge to be associate members even though they do not necessarily fit within that definition of an associate member. Retired postmaster members apparently comprised a subclass of associate members. Unless otherwise indicated, references to associate members will be to retired postmaster members, and, as indicated in supra↩ note 5, officers-in-charge generally will not be discussed herein.
7. A delegate to petitioner's annual national convention was a representative elected by petitioner's State branches who was entitled to vote for national officers and on any other issues before that convention.↩
8. In addition, as discussed below, starting in Aug. 1987 and throughout the remainder of the years at issue, another delegate became eligible to vote.↩
9. References herein to the AAC program may include time periods during which the program was called the deputy director program.↩
10. As used herein, the term "adverse action" includes a situation in which an employee is fired, demoted, suspended, or otherwise disciplined.↩
11. For convenience, both contracts will be referred to as the legal services contract. When distinguishing between the two contracts, the one dated Jul. 19, 1987, will be referred to as the first legal services contract, and the one dated Nov. 1, 1989, will be referred to as the second legal services contract. Sometime between Jul. 1987 and Nov. 1989, John P. DiFalco & Associates became John P. DiFalco & Associates, P.C. References to the "DiFalco law firm" will refer to either or both of those organizations.↩
12. The parties stipulated that the underwriter of the PBP for 1988, 1989, and 1990 was Connecticut Assurance Co., but petitioner has pointed out on brief, and the record establishes, that the actual underwriter was Continental Assurance Co.↩
13. Those employees and annuitants could also select certain health maintenance organizations, but those plans were limited to specified geographic areas.↩
14. The amounts listed include amounts attributable to postmaster members, retired postmaster members, and nonpostmaster members.↩
15. The designation "LBM" will be used only when referring to a league benefit member as defined in the NLP's articles of incorporation after the 1987 amendments and will not be used when referring to a limited benefit member as defined in its articles before those amendments.↩
16. Although the definition of LBM was presumably created in Aug. 1987, the first articles of incorporation in the record after Aug. 1987 are dated Aug. 1988.↩
17. Certain other benefits available to postmasters were not extended to LBMs during the years at issue. For example, during those years, petitioner (1) did not formally communicate the AAC program to LBMs or encourage their use of the program; (2) did not solicit, and in fact did not use, LBMs to act as AACs for either postmasters or other LBMs; (3) did not formally communicate the coordinator program to LBMs or encourage their use of it; (4) did not provide the LBMs with access to the State branch organizations and did not provide any similar organizations for LBMs; and (5) did not provide LBMs with the Advocate as part of their dues, although they could purchase it by paying the regular subscription fee.↩
18. At the same time that it created the LBM representative, petitioner granted a vote at the national convention to every organized State retiree organization.↩
19. As noted above, there were no State or local branch organizations for LBMs.↩
20. The amount appearing for each year in column four is not the product of columns two and three. The parties stipulated to those amounts, however, and the present record does not enable us to make any necessary corrections.↩
21. The parties stipulated that, in the event the Court were to hold that the dues collected from LBMs are includible in its UBTI, the service charge received for each year at issue as a result of the participation of LBMs in the PBP also is includible in its UBTI, as determined by respondent in the notice of deficiency. Conversely, the parties agree that, in the event the Court were to hold that the dues collected from the LBMs are not includible in its UBTI, the service charge received for each such year as a result of their participation in the PBP is not includible in its UBTI.↩
22. Our Opinion addresses only the issue of whether the LBM dues are includible in petitioner's UBTI for the years at issue. Nothing in this Opinion should be read as deciding or implying any conclusion of this Court with respect to the dues paid by, and the service charge received on account of, postmaster members and retired postmaster members that the parties stipulated for purposes of this case are not includible in UBTI.↩
23. For example, for 1989, petitioner collected $ 687,369 in dues from LBMs. The parties stipulated that if the dues from petitioner's LBM activity were subject to UBIT, it had deductions of $ 212,624 for 1989, which included amounts attributable to advertising the PBP. Accordingly, petitioner's net revenue for 1989 from the collection of dues from LBMs appears to be $ 474,745.↩
24. See supra↩ note 21.
25. Although the manner in which the activity is conducted must evince an intention to contribute importantly to the accomplishment of exempt purposes, a subjective intention to contribute importantly to the carrying on of such purposes is not enough to show the required causal connection where the conduct of the activity demonstrates that the intention was incidental to the purpose of raising revenue. Shiloh Youth Revival Centers v. Commissioner, 88 T.C. 565, 576↩ (1987). It would appear unlikely that the conduct of an activity could evince an intention to contribute importantly to the accomplishment of tax-exempt purposes unless it actually contributes importantly to the carrying on of such purposes.
26. In National Association of Postal Supervisors v. United States, 944 F.2d 859, 861↩ (Fed. Cir. 1991), the United States Court of Appeals for the Federal Circuit recognized that the provision of insurance by a labor organization to its members is consistent with its tax-exempt purposes only if done with the objective of improving the working conditions of those members.
27. In National Association of Postal Supervisors v. United States, supra at 861, the limited members received nothing except access to health insurance in return for their dues. In American Postal Workers Union v. United States, 925 F.2d 480, 482-483↩ (D.C. Cir. 1991), the limited members appear to have received some limited lobbying benefit in addition to access to health insurance.
28. In the present case, LBMs were members of the NLP in the sense that petitioner made certain benefits, including access to the PBP, available to them in return for their payment of dues. However, that fact, standing alone, does not lead to the conclusion that petitioner does not have UBTI as a result of its LBM activity.↩
29. We presume petitioner does not advance any argument that its LBM activity was substantially related during the years at issue to carrying on purposes 1, 2, 3, 5, and 7 because it believed, correctly we might add, that this Court would not sustain such an argument.↩
30. Respondent argues that encouraging social contact among members is not a purpose for which labor organizations are granted exemption. In view of the findings we have made and the conclusions we have reached herein, we need not decide whether respondent's argument is correct.↩
31. In fact, during the years at issue, petitioner's governing rules provided that only active postmaster and associate retired postmaster members were to be grouped as part of the State branches. It is also noteworthy that during those years petitioner's national organization retained 100 percent of all LBM dues. On the other hand, 50 percent of the dues of all active postmaster members and 42.5 to 45 percent of the dues of all retired postmaster members were distributed by petitioner to the State branch organizations, and 10 to 15 percent of the dues of all retired postmaster members were distributed to the retiree organizations.↩
32. We note that petitioner did advertise the national convention in The Insider during years subsequent to the years at issue. However, those advertisements did not advise LBMs that any special programs were to be conducted for them and did not even discuss the schedule of events.↩
33. We are not necessarily convinced, however, that petitioner's purpose 4 should be read so broadly as to include LBMs within it. First, neither that purpose nor any other purpose of petitioner changed in any significant manner as a result of the 1987 amendments that allowed the new category of members known as league benefit members to receive additional member benefits. Second, an examination of petitioner's activities and its very name indicate that petitioner was at all relevant times primarily an organization for postmasters.↩
34. Our Opinion addresses separately, as petitioner urges, each of the various rights and benefits available to LBMs during those years in order to determine whether its LBM activity was substantially related to the accomplishment of its purpose 4. Respondent urges us to analyze petitioner's LBM activity in the aggregate in order to make that determination. Regardless whether petitioner's LBM activity is examined in the aggregate or whether each benefit offered by petitioner to LBMs as part of its LBM activity is examined separately, we reach the same conclusion with respect to petitioner's LBM activity: on the instant record, petitioner failed to prove that it conducted its LBM activity during the years at issue in a manner that manifests its intention to contribute importantly to improving the working conditions of LBMs. As discussed herein, on that record, we find that petitioner failed to prove that any of the rights and benefits offered to LBMs during those years in return for their payment of dues was conducted in a manner that contributed importantly to improving the working conditions of LBMs. It is difficult to see how petitioner could prove, and petitioner did not prove, that its LBM activity in the aggregate was substantially related to the carrying on of its purpose 4 or any other of its exempt purposes.↩
35. Our conclusion is not intended to suggest that providing meaningful or controlling voting rights is a necessary element for proving that the conduct of a trade or business is substantially related to the carrying on of a labor organization's exempt purposes under applicable law.↩
36. We note that to the extent petitioner might have received inquiries from LBMs and might have responded to them in a meaningful or substantial way (facts not disclosed by the record), such efforts appear to be not unlike those of commercial companies that often seek input from their consumers in order to develop loyalty and to shape products in accordance with consumer demands. We also note that when the executive board did discuss possible benefits to offer members one of its concerns during the years at issue was whether such benefits would generate revenues for petitioner.↩
37. No inferences or implications regarding petitioner's making the PBP available to retired postmaster members should be drawn from this statement. The parties stipulated, inter alia, that dues from retired postmaster members and the portion of the service charge attributable to administering the PBP for such members are not subject to UBIT, and therefore that issue is not before the Court.↩
38. It is noteworthy that even though retired LBMs were not eligible to receive benefits under the legal services contract, part of their dues was used to pay the DiFalco law firm for the benefits provided under that contract. In contrast, presumably because they were not eligible for benefits under the legal services contract, retired postmaster members were not required to pay the special assessment that postmaster members were required to pay for the benefits under that contract.↩
39. Respondent objected in her answering brief on the grounds of hearsay to that claim made by petitioner in the brochure describing the legal services contract, which is one of the stipulated exhibits in this case. The first stipulation for trial to which that exhibit is attached provides in pertinent part: "Except for relevancy or materiality, all objections to this stipulation and its exhibits are expressly waived unless stated in this stipulation." Since respondent did not object in the first stipulation for trial on hearsay grounds to the statement in question, it is admissible in accordance with that stipulation. However, we are unwilling to place any weight on the claim made by petitioner in that exhibit because petitioner did not offer any evidence to corroborate its self-serving assertion.↩
40. In the LBM News dated Nov. 1988, petitioner stated that both its AACs and the DiFalco law firm were standing by to help LBMs faced with adverse actions. This is the only communication presented by petitioner that was directed towards LBMs in which it stated that the AACs were available to help them. It does not describe what the AACs were or describe what kind of assistance AACs would give to LBMs.↩
41. Mr. Swisher testified that he personally had helped limited benefit members while he was serving as a deputy director and/or AAC. However, none of the instances to which Mr. Swisher testified related to the years at issue because Mr. Swisher was not serving as a deputy director and/or AAC at that time.↩
42. Although The Insider did occasionally discuss legislation of interest to Federal employees (including postmasters), that publication does not establish, and petitioner has not otherwise proven, what action petitioner took on behalf of LBMs with respect to the legislative matters discussed in The Insider or how it represented LBMs when lobbying with respect to such matters. Our conclusions are not intended to imply that a legislative monitoring service could not be substantially related to the carrying on of exempt purposes of a labor organization. However, petitioner does not argue, and the record does not support a conclusion, that it conducted a legislative monitoring service in a manner that manifests its intention to contribute importantly to improving the working conditions of LBMs.↩
43. Even assuming arguendo that petitioner had established (which it did not) that a particular benefit made available to LBMs during the years at issue was substantially related to the carrying on of its exempt purposes, that would not necessarily have allowed us to conclude that petitioner's LBM activity during those years was substantially related to the carrying on of those purposes. We also note that petitioner does not argue and did not establish how much of the dues paid by LBMs was allocable to any particular benefit.↩
44. See supra↩ note 23 and accompanying text. Presumably, petitioner also generated additional net revenues from the participation of LBMs in the miscellaneous benefit programs, but the record is not enlightening in that respect.